## JAMES HOARE *v.* SAMUEL C. ALLEN.

EXCEPTIONS FROM CIRCUIT COURT, FIRST CIRCUIT.

SUBMITTED SEPTEMBER 18, 1900.    DECIDED JANUARY 23, 1901.

FREAR, C.J., GALBRAITH AND PERRY, JJ.

In 1881, one of the Associate Justices of the Supreme Court, after due hearing, made an order authorizing the guardian of the property of a minor to mortgage the property of his ward to secure payment of a sum of money to be borrowed for the purchase of a piece of land, known as Lot 5, adjoining land owned by the minor and known as Lots 2, 3 and 4, and for repairs on the buildings on the land last mentioned. The mortgage executed in pursuance of that authority passed by assignment to A. who subsequently foreclosed for breach of the condition, and the mortgaged premises were sold under a power of sale contained in the mortgage. The minor, on coming of age, brought an action of ejectment for said premises against one claiming under the purchaser at said sale.

Held: The order of the court authorized the mortgaging of Lot 5 as well as of Lots 2, 3 and 4.

The order authorized the execution by the guardian of a mortgage containing a power of sale.

17

Guardians of the property of minors did not in 1881, and do not now, possess the power formerly possessed by such guardians under Hawaiian common law to mortgage the real estate of their wards without authority from any court.

The Justices of the Supreme Court had in 1881, and the Circuit Judges have now, sitting, in Chambers, as Courts of Probate, the power to authorize the mortgaging of a minor's real estate whenever in their discretion it shall appear to be to the best interests of the minor to follow that course. This power should be exercised only with great caution.

OPINION OF THE COURT BY PERRY, J.

This is an action of ejectment brought to recover certain land, known as Lots 2, 3, 4 and 5, Robert's Row, situate on King street in this city, and now in the possession of the defendant under claim of ownership in fee. The facts of the case are undisputed, and may be briefly stated as follows:

James Hoare, the plaintiff, at the time a minor, was, on the 15th day of July, 1881, and thereafter until the time of the execution of the mortgage hereinafter referred to, the owner in fee of Lots 2, 3 and 4, and had possession thereof. On the 15th of July, 1881, A. Rosa, the guardian of his estate, filed a petition before the Honorable Lawrence McCully, Second Associate Justice of the Supreme Court, sitting in Chambers as a Court of Probate, containing *inter alia*, these allegations: "And your petitioner further represents that one Alexander J. Cartwright, Esq., administrator of the estate of Jeremiah O'Neill, deceased, is about to sell at public auction, on Saturday, the 16th day of July instant, a piece of real estate which directly adjoins the real estate belonging to his said ward, and which belongs to the estate of said J. O'Neill; and the wooden building which stands on said O'Neill premises joins the wooden building on the premises belonging to the Hoare Estate; and your petitioner verily believes it would be to the interest of his said ward that he be allowed to purchase the said O'Neill premises, and pledge the said O'Neill premises and the said Hoare premises for any sum that this Honorable Court may deem sufficient in the premises.  *  *  *

"And your petitioner further represents that the buildings on the premises of his said ward are very much in want of repair, and your petitioner believes that if proper repairs are put upon said buildings the income of the said estate would be very much increased.

"Wherefore your petitioner prays ⁣ * * * that your Honor will grant him an order to purchase the said premises belonging to the estate of J. O'Neill, deceased, and that he be: authorized and empowered to execute a mortgage of the premises above mentioned for such a sum that this Honorable Court may deem sufficient for the purposes aforesaid."

On the following day Justice McCully signed an order, "that said guardian may purchase the real estate mentioned in said petition, to wit, the O'Neill premises adjoining the Hoare premises on the Waikiki side, for the benefit of the estate of James Hoare, a minor, and that said guardian may execute a mortgage of said minor's estate for a sum of money not to exceed $2,500. for the purpose of paying the purchase price of said O'Neill premises, and for general improvements of the buildings of said estate."

The O'Neill premises referred to in that petition and order are Lot No. 5 of Robert's Row.

The guardian purchased Lot 5 by deed dated July 22, 1881, for the sum of $1,010., and duly paid the consideration to the Administrator of the estate of O'Neill; and on the 25th of the same month executed a mortgage to one Mary J. Brown of Lots 2, 3, 4 and 5 to secure the payment of a loan of $2,500., the mortgage containing a power of sale. The $1,010. paid for Lot 5 was a part of the $2,500. just mentioned. The mortgage passed by assignment from Mary J. Brown to the defendant, and subsequently the latter, for breach of condition, caused the mortgaged premises to be sold at public auction under the power contained in the mortgage, and through a trustee purchased all of the property at such sale.

The plaintiff upon coming of age instituted these proceedings, claiming that the Court had no jurisdiction to authorize the

mortgage of his property, and that, even if it did have such jurisdiction, the order made authorized neither the mortgaging of Lot 5, nor the insertion of a power of sale in the mortgage. The court below (trial by jury was waived) upon these agreed facts, found for the defendant, and the case comes to this Court on the plaintiff's exceptions. We shall consider the minor questions first.

The prayer of the guardian's petition clearly was for leave to mortgage Lot 5, as well as Lots 2, 3 and 4. The minutes of the proceedings had on that petition show that "the Court, on consideration, thought that it would be for the interest of said minor's estate that the prayer for authority to buy real estate and to mortgage said minor's estate be granted, and it was accordingly ordered." The order, as above stated, granted leave to "execute a mortgage of said minor's estate." We are of the opinion that the Court intended to grant and understood that it was granting the prayer of the petition in this respect *in toto*, i. e., for authority to mortgage Lot 5, as well as Lots 2, 3 and 4, and that this intention is sufficiently expressed in the order. The term "said minor's estate," as there used, is unlimited and unqualified, and refers to the estate as constituted at the time of the execution of the mortgage, and not as constituted at the date of the order.

So, also, we are of the opinion that the insertion of a power of sale in the mortgage, was authorized by the Court in its order. For many years prior to 1881 it had been the custom in these Islands to insert such powers in mortgages so as to facilitate their foreclosure. The Probate Court was undoubtedly aware of this practice, and of the further fact that the borrowing of money upon a mortgage that could be foreclosed only in a Court of Equity would be more difficult, if at all practicable, and perhaps more costly. The power of sale was already at that time such a common incident of mortgages that authority to insert it should, we think, be implied from the power to mortgage. The Court is to be presumed to have had in mind a mortgage in the usual sense of the word with all the remedies

to the mortgagee then in use and recognized by law. Had the Court desired to have an exception made in this instance by the omission of the power, it would undoubtedly have so specified in the order. On this subject see *Wilson v. Troupp*, 7 Johnson Ch. 25; 2 Jones' Mortgages, §1768; 26 Am. and Eng. Encycl. Law 870; 4 Kent Com. 146, 148; In re Chawner's Will, L. R. 8 Eq. 569; *Russel v. Plaice*, 18 Beav. 28; and *Bridges v. Longman*, 24 Beav. 29.

It is contended by some of the attorneys for the defendant that the guardian in this instance had, and that all guardians now have, under the common law of Hawaii, authority, independently of any power conferred by the Court, to mortgage the ward's real estate at pleasure, and that, consequently, it is immaterial whether the Court had jurisdiction to make the order now attacked. It is true that under the common law of Hawaii guardians formerly had that right. The Legislature recognized this when in 1851 it declared in the preamble to the Act of August 4, regulating guardians and wards, "Whereas, by the common law of this Kingdom guardians have, from time immemorial, possessed and exercised the absolute right to dispose the real and personal estate of their wards, as might suit their own will." That act, however, while it does not in terms refer to the guardians' pre-existing power to mortgage the real estate of their wards, nevertheless clearly shows and expresses the intention of the Legislature to repeal that provision of the common law of Hawaii, and to deprive guardians of all other powers theretofore possessed by them under said common law, and not by the Act expressly continued in or conferred upon them. The closing clause in the preamble is clear: "And whereas it is proper that the rights of guardians should be *abridged* and more clearly *defined*, therefore be it enacted," etc.

Did the Court have jurisdiction to make the order in question? Three possible sources of such jurisdiction have been suggested: the common law of Hawaii, our statutes, and the inherent power of a court of chancery under the common law of England. With reference to the first of these, it would seem

sufficient to say that no court of probate or other similar court existed under the Hawaiian common law, and that, therefore, no power could have been derived from that source.

No statute of ours, except as hereinafter stated, either expressly or by implication, confers on the court jurisdiction to grant leave to guardians to mortgage the real estate of their wards. The closest approach to it is in the provision, in the statute of 1851, whereby the court is permitted, under certain circumstances, to authorize the sale of the real estate of minors; but the power to authorize a sale admittedly does not include the power to authorize a mortgage.

As to the third source of jurisdiction. The oral argument in this case proceeded on the theory, and correctly, as we think, that our courts of probate in the matter of the care and supervision of the estate of minors possess, except as modified by statute, all the powers which the court of chancery in England originally possessed under the common law. The Act of 1851, while abridging the powers of guardians under Hawaiian common law, does not abridge the powers of the court with reference to the mortgaging of a minor's property. Section 847 of the Civil Code of 1859 provides: "The Chief Justice of the Supreme Court is the Chancellor of the Kingdom, and as such shall possess all the powers incident to that office at common law. He shall have power at chambers to decree the foreclosure of mortgages, and generally, to hear and determine all matters in equity, bankruptcy or admiralty; and the First Associate Justice shall act as Vice-Chancellor, and have full and concurrent jurisdiction in all matters at chambers with said chancellor." An act passed in 1862 (see Compiled Laws, §831) conferred upon the Second Associate Justice of the Supreme Court "the like power and duties as are possessed and exercised by the First Associate Justice"; and section 851 of the Civil Code of 1859 provides: "The several justices of the Supreme Court shall have the power at chambers to grant probate of wills, to appoint guardians and administrators, and again to compel all guardians, administrators and executors to perform their respec-

tive trusts and to account in all respects for the discharge of their official duties. They may in case of moral unfitness, or other good and sufficient cause, remove any administrator, guardian or executor, appointed by will or otherwise."

Did, then, the court of chancery have inherent jurisdiction at common law to authorize mortgages of the estates of minors? The authorities are not agreed on this point.

The majority, perhaps, of the text-writers state that, independently of statute, a court of equity has no authority to change the nature of an infant's estate from real into personal, or from personal into real, and some of them, more specifically, that the court has no inherent power to authorize a mortgage of the minor's real estate. Kent and Story, on the other hand, declare that the power resides in that court to change the property of infants from real into personal, and from personal into real, wherever it appears to be manifestly for the infant's benefit; and Maddock seems to be of the same opinion. The statements made by the text-writers are based largely upon reported decisions. See, generally, Schouler's Dom. Rel., pp. 480, 481; 1 Spence's Eq. Juris., p. 612; Bispham's Eq. p. 586; 3 Pom. Eq. Juris., §1309; Woerner's Gdshp., p. 177; 1 Maddock Ch., p. 268; 2 Story Eq. Juris., §1357; 2 Kent Com., p. 230.

Turning to the decisions, we are unable to satisfy ourselves of the correctness of the assertion, often repeated in the books, that the preponderance of authority is in favor of the view that the court of chancery has no inherent jurisdiction in the matter. Not all of the reports of cases cited on the subject are available to us, but, so far as we have been able to ascertain, the courts of Rhode Island, Massachusetts and Virginia have expressed the opinion that that court has no such jurisdiction, while those of New Jersey, Montana, Tennessee, Alabama, Illinois and perhaps Georgia, have held to the contrary. *Thurston v. Thurston*, 6 R. I. 301; *McCann v. Randall*, 147 Mass. 99; *Faulkner v. Davis*, 18 Gratt. (Va.) 651 (98 Am. Dec. 698); *Snowhill v. Snowhill*, 3 N. J. Eq. 22; *N. W. G. L. Co. v. Smith*, 38 Pac. (Montana) 225; *Hurt v. Long*, 16 S. W.

(Tenn.) 972; *Goodman v. Winter*, 64 Ala. 410, 435 (38 Am. R. 13); *Dodge v. Cole*, 97 Ill. 338. In New York the rulings have not been uniform, the court having held against the jurisdiction in *Rogers v. Dill*, 6 Hill 416 (1844); *Onderdonk v. Mott*, 34 Barb. 113 (1861); *Horton v. McCoy*, 47 N. Y. 21 (1871); *Battel v. Torrey*, 65 N. Y. 294 (1875); *Jenkins v. Fahey*, 73 N. Y. 361 (1878), and perhaps in one or two other cases; and in its favor *In re Salisbury*, 3 Johns. Ch. 348 (1818), and *Wood v. Mather*, 38 Barb. 482 (1862).

What is here said of New York may also be said of England. In *Taylor v. Phillips*, 2 Ves. Sr. 23 (1750), Lord Hardwicke said: "There is no instance of this Court's binding the inheritance of an infant by any discretionary act of the Court. As to personal things, as in the composition of debts, it has been done; but never as to the inheritance; for that would be taking on the Court a legislative authority, doing that which is properly the subject of a private bill." In *Simpson v. Jones*, 2 Russel & Mylne 365 (1831), it was held that the real estate of a female infant would not be bound by a settlement in contemplation of her marriage made with the approbation of the court, and that the court had no jurisdiction to give her the power of disposition of her property during her minority. *Russel v. Russel*, 1 Molloy 525, is often cited as an authority against the existence of the jurisdiction. *Calvert v. Godfrey*, 6 Beav. 106 (1843), and *Field v. Moore*, 19 Beav. 195 (1854), support the same view. On the other hand, in *Frith v. Cameron*, L. R. 12 Eq. Cs. 173 (1871), authority was granted, "under the general jurisdiction of the court," for the raising of money by a mortgage of the real estate of infants to be used in repairing a certain building, on the ground that the house is tumbling down," and that it would be "for the benefit of the infants" to follow that course. So, too, in *Re Jackson*, L. R. 21 Ch. Div. 789 (1882), where the court said: "I will now direct an inquiry whether any and what repairs of houses which are part of the infant's property are absolutely necessary to be done. I think that this jurisdiction should be jealously exer-

cised, and only in cases which amount to actual salvage. Any of the parties will have liberty to apply in chambers as to raising such sum as may be required for the doing of any repairs which may be certified to be absolutely necessary." In *Selby v. Cooling*, 23 Beav. 418 (1857), an order was made authorizing a mortgage of an infant's real estate for payment of debts and costs. *Inwood v. Twyne*, Amb. 419, is said to be another authority in favor of the jurisdiction.

Upon this state of the authorities we adopt that view which, on principle, seems to us to be correct and just.

In England the Sovereign was regarded as *parens patriae* and, as such, as having the duty cast upon him of protecting and caring for the persons and property of those subjects who, by reason of infancy or for other cause, were incapable of caring for themselves or their property. The Sovereign acted, in this respect, through the court of chancery, his powers and duties being regarded as delegated to the latter for the purposes mentioned. Included among these powers was that of the appointment, supervision and removal of guardians, the court acting largely through these officers in the details of its trust. Guardians had the authority, subject to the supervision of the court, to care for and manage the property of their wards, and to use the income and also the principal of the personal estate when necessary for the support, maintenance and education of their wards. The main reason for the refusal of the courts in some instances to assume jurisdiction to order a change in the nature of the property of the infants from real into personal, or to bind the inheritance, appears to have been that to do so would be to interrupt the course of descent of real property, contrary to the settled policy of the country. "The law of primogeniture was then in full vigor, and was regarded with great favor by the courts, and of course every severance of an estate necessarily interrupted the course of descent, and was justly regarded as antagonistic to the much cherished right of primogeniture. It was the pride of the English people to keep their large and valuable landed estates intact, so that they might descend from

generation to generation in the same family. Moreover, the lands there were almost universally productive, so that the income, as a general rule, was all that was necessary for the support of those laboring under disabilities, hence there was no necessity for the sale of the realty." *Dodge v. Cole*, 97 Ill. 360, 361. These reasons for distinguishing between real property and personalty do not apply in this country. The same persons who are the heirs of the real estate are also the distributees of the personal property of a decedent (the only difference in the disposition of the property being in the matter of dower). "The policy of this country is the very reverse of that which gave rise to the rule in England. With us it has been the settled policy to keep our lands unfettered by entailments, and to encourage, as far as possible, their free and untrammeled transfer from one to another." *Dodge v. Cole, supra.* Large landed estates, although there are some of them, cannot be said to be the rule here, and it often happens that infants find themselves without any personal property, and that the income of their real estate is utterly insufficient for their education, maintenance and support. The aim of our courts in assuming control over the estates of minors has been to see to it that such estates are managed and used for the best interests of the minors. The attainment of this object sometimes requires that a portion or the whole of their property be sold or encumbered, and the proceeds disposed of for their education, maintenance and support during their minority, so that they may be better able to care for themselves upon reaching their majority, or otherwise for their benefit; and no good reason suggests itself to us for distinguishing in this respect between their real and their personal property.

We are of the opinion that, the reasons which prevailed in England for the rule sometimes followed that the court would not exercise jurisdiction to sell or encumber an infant's real estate not existing here, the rule itself does not exist. No sufficent reason appearing for distinguishing between real and personal property in this connection, and there being weighty

considerations for regarding the two classes of property as being on the same basis, we hold that our courts of probate, which have, as already noted, all the power of a court of chancery in the matter, have inherent jurisdiction to authorize the mortgaging of a minor's real estate whenever in their discretion it shall appear to be to the best interests of the minor to follow that course.

We may add that for about twenty years past the view that our probate courts have this power has been entertained and acted upon by at least four Justices of the Supreme Court, and four Circuit Judges, each of whom has, in one or more instances, authorized guardians to mortgage the real estate of minors, and by a large number of the members of the bar.

While this jurisdiction should be jealously exercised, the question is not open, in a collateral proceeding, as to whether or not under the circumstances of any particular case the relief prayed for should have been granted.

The exceptions are overruled.

*Messrs. Kinney, Ballou & McClanahan,* and *H. A. Bigelow,* for plaintiff.

*Messrs. Hatch & Silliman, W. O. Smith* and *A. Lewis, Jr.,* for defendant.