IN THE MATTER OF THE GUARDIANSHIP OF
FRANCES CORNELIA THOMPSON, A MINOR.

No. 2060.

ARGUED AUGUST 10, 1932.          DECIDED AUGUST 15, 1932.

PERRY, C. J., BANKS AND PARSONS, JJ.

480

OPINION OF THE COURT BY PERRY, C. J.

This is a petition by a mother for the appointment of herself as guardian of the person of her infant daughter. The father, who at the date of the filing of the petition had the actual possession and custody of the child, resists the application. The proceedings were instituted before a circuit judge of the first circuit, sitting as the court of domestic relations, and that tribunal, after a very lengthy trial (the testimony is recorded in a transcript of 965 pages) at which all available testimony and other evidence was adduced, considerable portions of it perhaps being immaterial, awarded the custody and the guardianship to the petitioning mother. Its finding was that it was "for the best welfare and interests of the minor herein, a female child, twenty-one months old, to be in the custody of its mother, the petitioner herein, to remain with its mother in her home, with the right of

the respondent to visit said child at all reasonable times."
A decree was entered granting the prayer of the petition,
reserving in favor of the father certain defined rights
of visitation and expressly reserving to the court the
right to amend the decree upon due cause shown.

At its session in 1931 the legislature passed an Act,
which duly became law, reading as follows: "Natural
Guardian. The father and mother of an unmarried
minor child are jointly the natural guardians of its
person and property. They shall have equal powers and
duties with respect to it and neither shall have any right
superior to that of the other concerning its custody or
control or any other matter affecting it; provided, that,
if either parent dies or abandons his or her family or is
incapable for any reason to act as guardian, the guardian-
ship devolves upon the other parent, and that, when the
parents live apart, the court may award the guardianship
to either of them, having special regard to the interests
of the child; the father and mother of unmarried minor
children shall jointly and severally be liable in damages
for tortious acts committed by said children, and shall
be jointly and/or severally entitled to prosecute and
defend all actions in law or in equity in which such
children or their individual property may be concerned."
L. 1931, Act 77. In so doing the legislature expressly
amended section 3033, R. L. 1925; and by implication
this statute of 1931, being the latest expression of the
will of the legislature on the subject, necessarily repeals,
amends and supplants any other preexisting statutes in
conflict therewith. The language of the above quoted
statute of 1931 is clear and unambiguous. Its meaning
and intent are not open to doubt. While primarily the
father and the mother of an unmarried minor child are
declared to be "jointly the natural guardians" of its person
(questions of property are not here involved), provision

is also made for certain circumstances under which both parents cannot jointly be the guardians and one or the other of them alone can be or should be. One of the provisos is that if either parent "abandons his or her family" the guardianship devolves upon the other parent, and another is that "when the parents live apart" the court may award the guardianship to either of them "having special regard to the interests of the child."

The respondent in the case at bar claims that the mother abandoned her family and that for that reason the guardianship devolved upon the father. The material facts with reference to the claim of so-called abandonment are not in material respects in dispute. The parents were married in Canada on August 19, 1929, and lived there until April, 1930, when the mother left for Honolulu to be with her mother at the time of the expected arrival of the child. The child was born on July 13, 1930, and was in the immediate care of its mother until the following October, the father during that period of about three months being in Canada. The mother and the baby left Honolulu in October and arrived at the home of the father in Canada in November and there the three lived together until February, 1931, when all left for Honolulu, arriving there in March of that year. At first they lived with the mother's parents at their home and on June 1, 1931, moved to a home of their own on Armstrong Street in Manoa in this city, not far from the home of the mother's parents. The Armstrong Street house continued to be their home until November 28, 1931, although about the middle of September the father accepted employment at Waimanalo Plantation on the northern side of this island and between that date and November 28 made occasional visits to his wife and child. From the 1st until the 15th of August of the same year the mother, with the child, visited with the grandmother at a place

called Kalama. It is clear and undisputed that there was no separation, actual or legal, between the father and the mother prior to November 29, 1931, with the sole exception, if it may be called an exception, that beginning with August 15 the wife refused sexual intercourse. As a matter of law it may properly be said that the father and the mother had joint possession and custody of the child from the day of its birth until November 29, 1931, and it certainly is the fact that during the whole of that period of time the mother actively shared in that custody and that for some considerable parts of it she alone had the physical, actual care and custody. On November 29, 1931, the father and the mother separated and have ever since been living apart. On that day they quarreled about the custody of the child. To make a long story short, for a few hours on that day the child was by the consent of the two parents left in the custody of a Mrs. Silva, recommended to them by a probation officer as a suitable person to have its care. On the evening of that day the grandfather endeavored to secure a return of the child to its mother, but failed in the effort. A little later, on the same evening, the father secured the child and took it to his home at Waimanalo without the knowledge or consent of the mother and has there maintained it ever since, against the will and in spite of the efforts of the mother to obtain its custody. This proceeding in which the mother asks to be appointed the child's guardian was instituted on December 1, 1931, only two days after the father took actual possession of the child. He had that possession during those two days clearly against the will and the efforts of the mother to obtain it. Under all of these circumstances here recited there is not the slightest foundation for the claim that the mother at any time abandoned the child. She held it and cared for it as long as she was permitted to do so

and as soon as the child was taken away from her she sought the aid of the court to recover its possession.

When, as in this instance, the family consists simply of a father, a mother and one child and the mother has not abandoned the child but has become separated from the husband, in our opinion there is not an abandonment by the wife "of her family" within the meaning of Act 77. That this was the intention and understanding of the legislature is made clear by the fact that in a succeeding proviso the legislature provides for the very contingency of a husband and a wife living apart.

A second contention advanced by the respondent is that when a wife, without due cause, leaves her husband there is not such a living apart as is contemplated by this statute. We do not so construe the language used by the legislature. To so hold would be to introduce a qualification which is entirely unexpressed in the statute. The one fact mentioned by the legislature which would authorize the court to award the guardianship to either parent "having special regard to the best interests of the child" was that the parents should be living apart. There was no provision as to the result that should follow if the wife was at fault or as to what the result should be if the husband was at fault or if the separation was by mutual consent. The important contingency provided for was that the two parents were living apart,—a condition under which it would be an impossibility for both of them at the same time to have the actual, physical custody and care of the child.

At this point it is contended on behalf of the respondent that Act 77 is unconstitutional in that, as it is said, it violates Articles V, XIV and IX of the Constitution of the United States. The claim is that it violates the provision that no person shall "be deprived of life, liberty or property without due process of law," guarantees

contained in Articles V and XIV. Assuming that the "liberty" referred to in these amendments includes the primary right of a father to have the custody of his child, it is obvious, nevertheless, that in the controversy under consideration there has been no absence of due process of law. Proceedings were formally instituted in a court of competent jurisdiction by a petition in customary form, the respondent had due notice and ample opportunity to be heard and both parties were permitted to present all the evidence and arguments which they wished to present. The court considered and determined the issues and rendered a decree. The requirements of due process of law were clearly complied with.

Attention is called by counsel to the provision of Article IX, "the enumeration in the Constitution of certain rights shall not be construed to deny or disparage others retained by the people," and the argument is that it is the unwritten, inalienable right of a father to have the custody and care of his child. This same argument is the only one advanced in support of the contention that the guarantee of "liberty" is violated by the deprivation of this "inalienable" right. We do not know of any such inalienable right in a father. From time immemorial American courts have acted upon the theory, following the English doctrine that the sovereign was regarded as the *parens patriae,* that the father may be judicially deprived of the care and custody of his minor child whenever that course is required by the best interests of the child and that the best interests of the child are the important and guiding consideration. In many instances children of tender years, and particularly little girls, have been taken from fathers who were without fault and placed in the custody of their mothers. Our attention has not been called to any case in which the Constitution of the United States was invoked as prevent-

ing that procedure; and we know of none.

In *Hoare* v. *Allen,* 13 Haw. 257, 265, this court recognized the English doctrine just referred to and said: "In England the Sovereign was regarded as *parens patriae* and, as such, as having the duty cast upon him of protecting and caring for the persons and property of those subjects who, by reason of infancy or for other cause, were incapable of caring for themselves or their property. The Sovereign acted, in this respect, through the court of chancery, his powers and duties being regarded as delegated to the latter for the purposes mentioned. Included among these powers was that of the appointment, supervision and removal of guardians, the court acting largely through these officers in the details of its trust."

In the case entitled *In re Muranaka,* 26 Haw. 465, 466, 467, this court said: "In disputes between parents over the custody of their children the primary right of custody reposed in the father under the statute is not, however, an absolute right but is subject to the general rule that the welfare of the child is the paramount consideration, in pursuance of which the mother may be given preference over the father where her custody appears most beneficial to the child.

" 'In conflicting claims between parents for the custody of their legitimate children, the right of the father was held paramount to that of the mother; but the first and cardinal rule by which the courts were governed in awarding the custody was the welfare of the child, and not the technical legal right. The courts were not quite so free to exercise their discretion in the father's favor, by giving him the custody of his child, when the child was not in the father's custody; but if he already had the custody, it would not take it from him, unless he was guilty of neglect or abuse, or his conduct was such that there was probability of moral contamination.' Church on Habeas Corpus, Sec. 426.

" 'While the statute * * * provides that the father, if a suitable person, shall have the custody and care of his minor children, yet this is not an absolute right, for in controversies between parents as to their custody, the welfare of the children will be given controlling consideration by the court.' *State ex rel Greenwood* v. *Greenwood,* 87 N. W. (Wis.) 489.

" 'The father is the natural guardian of his infant children, and has a paramount right to their custody; but the right to the custody of his children is not, like the right of property, an absolute and unconditional right. It is now too well settled to call for citation of authority that in this class of cases the widest discretion rests in the court, whether at common law or in chancery * * * and that the supreme and paramount consideration in all cases is the welfare of the child or children involved in the controversy. However pure and upright the father may be, and able financially to provide for his child, circumstances may exist that would imperatively demand a denial of the father's right and the continuance of the child with the mother.' *Taylor* v. *Taylor,* 50 S. E. (Va.) 273, 276."

These views were reaffirmed in *Wong* v. *Wong,* 27 Haw. 742. While in these two Hawaiian cases earlier statutes were being considered, the language quoted is nevertheless of interest in considering the subject of the supposed inalienability of the right of a father to the custody of his child. In our opinion the statute is not, for the reasons urged, unconstitutional.

Concerning the suitability of the petitioning mother to the custody of her child, "no charge of sexual immorality," to use the language of respondent's counsel, is made against her. The utmost which is claimed by the respondent to be shown by the evidence against the mother's character is (a) that for the period above stated she denied the respondent intercourse, (b) that she perjured herself on the witness stand at the trial of this case and (c) that she is of an "unstable, changeable and vacillating" nature. These three facts, even if supported

by the evidence, do not in our opinion indicate that the mother is unsuitable to have the care and custody of her own offspring. It is admitted that she is not in ill health and is not of unclean habits. She was born in 1908 and is now twenty-four years of age. She was educated at one of the leading high schools of this Territory and subsequently took the first year's course in the University of Hawaii. There is no reason for supposing that she is other than a young woman of refinement and culture. The circuit judge who saw her day by day during the lengthy trial and who heard her testimony found her to be a suitable custodian of the child. In truth her husband's own estimate of her, with all of the acquaintance and knowledge that he has of her, is indicated by his willingness and desire, expressed at the trial below and in this court, to have her return to him and live with him, the two jointly to have the care and custody of the child. We find that she is a suitable person to have the custody.

At the time of the institution of these proceedings the child was less than seventeen months of age. Now she is twenty-five months of age. The important fact is that she is a little girl of tender years, needing constant care and attentions of an intimate nature. It is due to her that she should have the companionship, the care and the guidance of her own mother. The father, however excellent his other qualifications may be, cannot, both from the nature of the case and from the fact of his being necessarily in the employ of others during a large part of each twenty-four hours, give her that same care and attention. Because of these facts he has followed the course which would be indispensable in the case of his having the legal custody, to-wit, of placing the child in the immediate care and control of another woman, a stranger in blood. As between such a stranger and the

child's own mother there can be no doubt and no hesitation that the child should be with its mother.

The decree appealed from is in all respects affirmed. As there provided, the tribunal having jurisdiction of the matter will always be at liberty, upon due cause shown, to amend the decree. A decree of affirmance will be entered in this court.

*J. V. Hodgson* (*E. C. Peters* on the brief) for petitioner.

*H. E. Stafford* (also on the briefs) for respondent.