**Electronically Filed
Supreme Court
SCAP-15-0000022
03-NOV-2016
10:35 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

A.A.,
Petitioner/Petitioner-Appellant,

vs.

B.B.,
Respondent/Respondent-Appellee.

SCAP-15-0000022

APPEAL FROM THE FAMILY COURT OF THE THIRD CIRCUIT
(CAAP-15-0000022; FC-M NO. 14-1-0034K)

NOVEMBER 3, 2016

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY POLLACK, J.

Petitioner A.A. and Respondent B.B. decided together to bring a child into their home. Although only B.B. legally adopted the child, A.A. and B.B. co-parented the child and shared physical custody of her, even after their separation as a couple. A.A. brought a petition for joint custody in the Family Court of the Third Circuit (family court) based solely on the de facto custody provision of Hawaiʻi Revised Statutes (HRS) § 571-

46(a)(2), which was denied. A.A. appealed the family court's denial of his petition and applied for a transfer to this court, which we granted.

The main issue on appeal concerns the interpretation and application of Hawaii's statutory de facto custody provision and whether it infringes on B.B.'s parental rights. Because we conclude that the family court misinterpreted and misapplied the de facto custody provision, we vacate the family court's decision and remand the case for further proceedings.

## I. BACKGROUND

### A. Factual Background

A.A. and B.B. entered into a committed relationship in March 2009 and lived together continuously until October 2013. Child was born in September 2011, and B.B. is the biological grandfather and legal adoptive father of Child.

The decision to adopt and raise Child was a joint decision made by B.B. and A.A. Together they determined a first and last name for the baby, giving her each of their last names separated by a hyphen. A.A., B.B., Child, and B.B.'s teenage son lived together as a family unit from October 2011 until October 2013. During this time, A.A. and B.B. jointly shared all parental care, duties, and responsibilities for Child. From the time she could talk, Child referred to B.B. as "Papa" and A.A. as "Daddy." A.A. and B.B. discussed and intended that A.A.

2

would adopt Child, and they retained an attorney to accomplish the adoption. However, A.A.'s planned adoption of Child never occurred, and although A.A. and B.B. discussed entering into a civil union or marriage, that also never occurred.

After their separation in October 2013, B.B. and A.A. entered into a written 50/50 co-parenting agreement for Child. Under the co-parenting agreement, A.A. and B.B. each had actual care and custody of Child from Sunday to Wednesday and then Sunday to Thursday in alternating weeks. During the period of the co-parenting agreement, A.A. and B.B. communicated through email to discuss Child. B.B. indicated to A.A. by email that he wanted A.A. to have custody of Child should anything ever happen to him. In April 2014, B.B. sent A.A. a letter declaring that the written 50/50 co-parenting agreement was revoked on the ground that it was B.B.'s "parental right" to do so.

### B. A.A.'s Petition for Joint Custody

A.A. filed a petition for joint custody in the family court in May 2014, seeking joint legal and joint 50/50 actual physical custody of Child pursuant to HRS § 571-46(a)(2).[1]

---

[1] HRS § 571-46(a)(2) (Supp. 2013) provides,

(a) . . . . In awarding the custody, the court shall be guided by the following standards, considerations, and procedures:

 . . . .

(continued . . .)

3

A.A.'s petition alleged that he had de facto joint custody of Child "in a stable and wholesome home" and that he was "a fit and proper person to have care, custody, and control of the minor child."

The family court held an initial hearing on A.A.'s petition for joint custody in June 2014.[2]  At the June hearing, the court noted that there were no disputed facts in the case and that the issue was whether B.B. has the absolute right to dictate who can have custody of the minor child.

During the evidentiary hearing held in October, B.B. offered Dr. Jennifer L. De Costa as "an expert in the field of family behaviors and in the relationship of children with their families."[3]  A.A. objected to Dr. De Costa's qualification as an expert, asserting that she should be qualified as a marriage and family counselor; the family court concluded that Dr. De Costa

_____

(2) Custody may be awarded to persons other than the father or mother whenever the award serves the best interest of the child. Any person who has had de facto custody of the child in a stable and wholesome home and is a fit and proper person shall be entitled prima facie to an award of custody . . . .

[2]     The Honorable Melvin H. Fujino presided.

[3]     Dr. De Costa testified that she was a behavior health specialist at Innovative Hawaiʻi Community Hospital and possessed a bachelor's degree in psychology from the University of Hawaiʻi, a master's degree in science from Western Washington University, a master's degree in marriage and family therapy from University of Oregon, and a doctorate degree from Oregon State University in family counseling and gerontology.

was an expert in the field of family behavior and relationships as it relates to children and families.

On direct examination, Dr. De Costa testified extensively about B.B.'s teenage son. Dr. De Costa was permitted to testify over A.A.'s objection that she saw a correlation between depressive symptoms exhibited by B.B.'s son and interactions with A.A.; she discussed this correlation in reference to B.B.'s son's performance on tests used to measure depression and anxiety. Dr. De Costa also testified regarding her counseling and treatment of Child. B.B.'s counsel requested Dr. De Costa to assume that A.A. had an anger management problem and asked her to offer an opinion as to whether she would have any concerns of Child having a custodial relationship with A.A. A.A. objected to the testimony on the basis that the hypothetical question assumed facts not in evidence.[4] Dr. De Costa was permitted to opine that she would have concerns about Child having a relationship with A.A. Dr. De Costa was also asked whether Child would be harmed from termination of the relationship with A.A.; she testified, "This is a hard one. But I don't--right now, where she's at, I don't think so."

---

[4] A.A. later testified that he had an anger management problem that interfered with his relationship with B.B..

A.A. offered Dr. Jamuna Wyss, a clinical psychologist, as an expert on parent-child psychological relationships and parenting styles. Dr. Wyss indicated that A.A. and B.B. attended couples therapy with him beginning in October 2013 and that A.A. continued to be his client in individual therapy. Dr. Wyss gave a favorable opinion regarding A.A. as a parent and the home he provided for Child. Dr. Wyss also testified regarding the consequences when parent-child relationships are terminated, opining that there was a likelihood that termination of the relationship between A.A. and Child would result in "immediate-term and long-term damaging psychological consequences" to Child.

A.A.'s counsel also attempted to enter into evidence a clinical note of Dr. Wyss's related to sex-abuse allegations involving A.A. The court did not accept the note into evidence and did not allow Dr. Wyss to testify regarding the allegation because it was outside the scope of Dr. Wyss's report. However, Dr. Wyss was permitted to testify that he was aware of sex-abuse allegations involving A.A. and that he did not believe that A.A. posed a threat of abuse to Child, "be it sexual, physical, or emotional abuse or neglect."

On December 11, 2014, the family court entered its "Findings of Fact, Conclusions of Law; Order/Final Judgment" denying A.A.'s petition for joint custody. The family court

characterized the main issue as follows: "[I]n a State where the parties can get married or can become a civil union partnership, if they choose not to, . . . should [A.A.] be afforded standing to claim what is known as a 'psychological father.'" The court concluded that A.A. did not have standing as Child's "psychological father" because the parties were not married. Although the family court determined that HRS § 571-46 applied, which allows a custody award to a person who demonstrates de facto custody of a child, the court concluded that A.A. failed to demonstrate "by strict scrutiny a compelling state interest as to why this 'de facto' section should apply to him when in fact the parties were not married, and when the options of civil union or marriage were available."[5]

## II. DISCUSSION

A.A.'s petition requested joint custody of Child pursuant to HRS § 571-46(a)(2), asserting that A.A. "is a person who has had de facto joint custody of the child in a stable and wholesome home" and that joint custody was in the best interests of Child.[6] Although the family court determined that HRS § 571-

---

[5] The family court also found, "In this case the Court will find compelling the testimony of the child's therapist, Jennifer De Costa, in the sense that she testified that in her opinion that the child would not be harmed and in fact that she did see some regression once the Court allowed supervised visitation between [Child and A.A.]."

[6] A.A. sought custody of Child based solely on the de facto provision of HRS § 571-46(a)(2). Additionally, in his opening brief, A.A.

(continued . . .)

7

46(a)(2) was applicable, the court declined to apply this statutory provision, reasoning that A.A. failed to demonstrate "by strict scrutiny a compelling state interest" to support the application of the statute under the circumstances of this case. Thus, the primary issues on appeal are whether the family court properly interpreted and applied HRS § 571-46(a)(2) and whether its application in this case would infringe on B.B.'s constitutionally protected parental rights. A.A. also challenges several evidentiary rulings regarding the expert testimony presented at the hearing.

**A. Interpretation and Application of HRS § 571-46(a)(2)**

In cases involving child custody, it is well established that the guiding consideration is the best interests of the child. E.g., Doe v. Doe, 98 Hawai'i 144, 155, 44 P.3d 1085, 1096 (2002); Fujikane v. Fujikane, 61 Haw. 352, 354, 604

_____

cites only to HRS § 571-46(a)(2)--and not HRS § 571-46(a)(1)--as a basis for his claim for custody of Child. Although A.A. references the "parent by estoppel" doctrine of other jurisdictions in his opening brief, he does so in support of his argument that the trial court erred in its determination that A.A. was required to show by strict scrutiny a compelling state interest as to why HRS § 571-46(a)(2) should apply to him. Thus, it appears that to the extent that A.A. argues that he satisfies the doctrine adopted by the Wisconsin Supreme Court, it is to support his argument that the application of this statute is constitutional.

Accordingly, we do not consider whether A.A. is a "parent" eligible to seek custody pursuant to HRS § 571-46(a)(1) or on any other basis. It is noted that at least one jurisdiction has expanded the definition of "parent" in a similar statute to include a partner of a domestic partnership that agrees to conceive a child and to raise the child together. See Brooke S.B. v. Elizabeth A. C.C., No. 91, 2016 WL 4507780 (N.Y. Aug. 30, 2016).

P.2d 43, 45 (1979) (per curiam). The trial court possesses broad discretion in making custody decisions and in its determination of what is in the best interests of the child. Fujikane, 61 Haw. at 354, 604 P.2d at 45 ("It is clear that the court below possesses wide discretion in making custody decisions . . . ."). HRS § 571-46(a) provides standards that apply to a court's custody decision in proceedings involving a dispute as to the custody of a minor child:

> In awarding the custody, the court shall be guided by the following standards, considerations, and procedures:
>
> (1) Custody should be awarded to either parent or to both parents according to the best interests of the child, and the court also may consider frequent, continuing, and meaningful contact of each parent with the child unless the court finds that a parent is unable to act in the best interest of the child;
>
> (2) Custody may be awarded to persons other than the father or mother whenever the award serves the best interest of the child. Any person who has had de facto custody of the child in a stable and wholesome home and is a fit and proper person shall be entitled prima facie to an award of custody;
>
> (3) If a child is of sufficient age and capacity to reason, so as to form an intelligent preference, the child's wishes as to custody shall be considered and be given due weight by the court . . . .

HRS § 571-46(a)(1)-(3) (Supp. 2013).

Subsection (a)(1) of this statute concerns the awarding of custody to the child's parents and provides that custody "should be awarded" to either or both parents according to the best interests of the child. Additionally, the court may consider continuing and meaningful contact of each parent with the child unless the parent is unable to act in the best

9

interests of the child.[7]  In his petition for custody, A.A. does not seek custody based on alleged parental status under subsection (a)(1).

Subsection (a)(2), upon which A.A. relies, provides that custody "may be awarded to persons other than the father or mother whenever the award serves the best interest of the child."  Subsection (a)(2) also creates a presumption in favor of a person under certain circumstances: "Any person who has had de facto custody of the child in a stable and wholesome home and is a fit and proper person shall be entitled prima facie to an award of custody."  Although "de facto custody" is not defined, we interpret it to mean sole or shared physical custody in combination with an assumption of incidents of legal custody enumerated in HRS § 571-2, which include "the duty to protect, train, and discipline the minor and to provide the minor with food, shelter, education, and ordinary medical care."  In other words, de facto custody is consistent with a parental role.

Accordingly, a person may establish a prima facie case of de facto custody, by showing that the person (1) is a fit and proper person (2) who has had de facto custody of the child (3)

---

[7]     "'Meaningful contact' means parent and child interactions, activities, and experiences, performed together, which nurture the parent-child attachment and relationship, while contributing to the child's development in a positive and effective manner."  HRS § 571-2 (2006 & Supp. 2011).

in a stable and wholesome home. HRS § 571-46(a)(2). If a person is able to establish these three elements, then the person has adduced prima facie evidence that awarding custody to that person is in the best interests of the child. Nonetheless, the family court ultimately has the discretion to determine the custody award that would serve the best interests of the child based on the entirety of the evidence presented.

Although the family court determined that HRS § 571-46(a)(2) applies to this case, the court did not determine whether or not A.A. established a prima facie case to an award of custody based on de facto custody.[8] However, the family court did not make any particular findings that would contradict A.A.'s claim of de facto custody pursuant to subsection (a)(2), and A.A. provided evidence to support all three elements of subsection (a)(2) in addition to evidence from Dr. Wyss that it would be beneficial to Child to have contact with him. On the

_____

[8] Although we express no opinion as to whether A.A. established prima facie that he had de facto custody of child pursuant to HRS § 571-46(a)(2), it is noted that the record was sufficient to support a finding that A.A. had de facto custody of Child because B.B. shared all parental care, duties, and responsibilities with respect to Child with A.A. from October 2011 to October 2013 and then continued to have actual joint custody of Child until April 2014, pursuant to the written co-parenting agreement. The family court's findings would also support a determination that A.A. provided a stable and loving home for Child, based on, inter alia, the court's findings regarding the period of joint custody and Dr. Wyss's testimony that termination of the attachment bond between A.A. and Child would be psychologically harmful to Child. The findings that would support the first two elements may also support a finding that A.A. was a fit and proper person to have custody of Child given that he was involved in co-parenting Child for the majority of Child's life.

other hand, B.B. produced evidence, including through Dr. De Costa's testimony, that could be construed to support a finding that A.A. is not a fit and proper person and that it would not be in Child's best interests for custody to be jointly awarded to A.A.

In declining to apply subsection (a)(2), the family court reasoned that A.A. did not adequately demonstrate by strict scrutiny a compelling state interest that the statute was constitutional as applied to him.[9] The burden, however, is not on A.A. to demonstrate the constitutionality of HRS § 571-46(a)(2). Indeed, "every enactment of the legislature is presumptively constitutional," and the "party challenging the statute has the burden of showing unconstitutionality." State v. Mueller, 66 Haw. 616, 627, 671 P.2d 1351, 1358 (1983) (quoting Schwab v. Ariyoshi, 58 Haw. 25, 31, 564 P.2d 135, 139 (1977)). Thus, in this case, if joint custody were awarded to A.A., then B.B. would be considered the challenger to HRS § 571-46(a)(2), and B.B. would have the burden of establishing the statute's infringement on his constitutionally protected parental rights. Id.

---

[9] We review the family court's conclusions of law, including constitutional questions of law, de novo under the right/wrong standard. See Doe v. Doe, 116 Hawai'i 323, 326, 172 P.3d 1067, 1070 (2007); In re Doe, 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001).

12

The family court's analysis was directly contrary to this widely accepted presumption that statutes are valid. Accordingly, the family court erred in requiring that A.A. establish the constitutionality of HRS § 571-46(a)(2) before its application. The family court should have made findings and conclusions with regard to whether A.A. satisfied the de facto custody test of subsection (a)(2) and whether granting of joint custody was in the best interests of Child.

B.B. argues that HRS § 571-46 prefers that custody be awarded to the parents of a child and that a non-parent may only be considered for custody if the court finds that the parent is unable to act in the best interests of the child. We do not agree with this rigid interpretation of HRS § 571-46, which is contrary to the well-settled principle that "the paramount consideration" in child custody cases is the best interests of the child. Doe, 98 Hawai'i at 155, 44 P.3d 1085 at 1096. While a preference inheres in HRS § 571-46(a)(1) that custody "should" be awarded to the parents, nevertheless custody may be awarded to persons other than a parent and the court "shall" consider the child's wishes if the child is of sufficient age and capacity to reason. HRS § 571-46(a)(1)-(3). Implicit in B.B.'s proffered interpretation is the concept that custody will be given either to a parent or nonparent. However, in reality, there may be instances where the child's best interests are

served by joint custody where a fit parent and nonparent share responsibilities for the child.

The court must always determine what would serve the best interests of the child. HRS § 571-46 provides guidance to the courts by way of standards, considerations, and procedures, and ultimately, the court has the flexibility to fashion a custody award that is in the best interests of the child. In this case, the family court erred in concluding that A.A. was required to establish, as a threshold matter, that the application of HRS § 571-46(a)(2) to his claim for custody would be constitutional. Because the court did not make a determination as to whether A.A. established a prima facie case of de facto custody under HRS § 571-46(a)(2) and did not make findings of fact and conclusions on this ultimate issue, the record is insufficient for appellate review of the custody decision. Accordingly, the case must be remanded to the family court for further proceedings.

**B. B.B.'s Constitutionally Protected Parental Rights**

In his answering brief, B.B. argues that HRS § 571-46(a)(2) "is being utilized by [A.A.] to attempt to interfere with [B.B.'s] right to raise his child and protect his child from the conduct, belief, opinions, language, personality, and

demeanor of [A.A.]."[10]  In light of the remand of this case to the family court, we address B.B.'s constitutional challenge to HRS § 571-46(a)(2).[11]

B.B.'s constitutional argument raises questions regarding whether HRS § 571-46(a)(2) unreasonably interferes with B.B.'s decision as a parent to no longer share custody with A.A..  Accordingly, we consider whether Hawaii's de facto custody provision--which uses a "best interests of the child standard"--unconstitutionally infringes on a person's parental rights where the nonparent has had actual custody of the child in a stable and wholesome home, is a fit and proper person, the parent has voluntarily incorporated the nonparent into the family unit sharing parental responsibilities and duties, and the parties subsequently shared custody pursuant to a written co-parenting agreement.

The Fourteenth Amendment to the United States Constitution and article I, section 5 of the Hawai'i Constitution provide that no person shall be deprived of "life, liberty, or property without due process of law."  U.S. Const. amend. XIV, §

---

[10]  The record does not indicate whether B.B. notified the Attorney General of the State of Hawai'i of his challenge to the constitutionality of HRS § 571-46(a)(2) pursuant to his duty under Hawai'i Rules of Appellate Procedure Rule 44.

[11]  For purposes of considering the constitutional issue raised by B.B., we assume that A.A. satisfies the de facto custody provision.  However, as mentioned, we express no opinion as to whether A.A. satisfied the three elements necessary to raise the de facto presumption.

15

1; Haw. Const. art. I, § 5.  Under the Hawai'i Constitution, we conduct a two-step inquiry in analyzing procedural due process claims.  We first consider whether a liberty or property interest has been interfered with by the State, and second, we determine what specific procedures are required to satisfy due process.  State v. Guidry, 105 Hawai'i 222, 227, 96 P.3d 242, 247 (2004).  Similarly, when the Due Process Clause "is invoked in a novel context," the Supreme Court of the United States "begin[s] the inquiry with a determination of the precise nature of the private interest that is threatened by the State."  Lehr v. Robertson, 463 U.S. 248, 256 (1983); see Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (noting that the court has required "'a careful description' of the asserted fundamental liberty interest" (quoting Reno v. Flores, 507 U.S. 292, 301 (1993))).  It is only after that interest has been identified that the court can "properly evaluate the adequacy of the State's process."  Lehr, 463 U.S. at 256.

Whether a parent has a constitutionally protected liberty interest in deciding that a person who has "de facto custody" of the child should no longer have custody is a matter of first impression in this jurisdiction.  It has long been recognized that the due process clause protects certain liberty interests that parents have in maintaining relationships with their children and in directing their upbringing.  See, e.g.,

16

Troxel v. Granville, 530 U.S. 57, 65 (2000).  Independent of the United States Constitution, parents have a substantive liberty interest in the care, custody, and control of their children protected by the due process clause of article I, section 5 of the Hawai'i Constitution and the right to privacy of article I, section 6 of the Hawai'i Constitution.  See Doe v. Doe, 116 Hawai'i 323, 334, 172 P.3d 1067, 1078 (2007) ("Parents' right to raise their children is protected under article I, section 6 of the Hawai'i Constitution . . . ."); In re Doe, 99 Hawai'i 522, 533, 57 P.3d 447, 458 (2002) ("We affirm, independent of the federal constitution, that parents have a substantive liberty interest in the care, custody, and control of their children protected by the due process clause of article 1, section 5 of the Hawai'i Constitution.").

Although due process jurisprudence recognizes a substantive liberty interest in directing the upbringing of one's child without state interference, the right is largely undefined.  In Troxel v. Granville, the United States Supreme Court reviewed the Washington Supreme Court's determination that a Washington visitation statute violated the United States Constitution.  A majority of the Court agreed to affirm the Washington Supreme Court's decision.  The plurality opinion, written by Justice Sandra Day O'Connor, found that the Washington visitation statute was "breathtakingly broad" because

its language effectively permitted "any third party seeking visitation to subject any decision by a parent concerning visitation of the parent's children to state-court review." 530 U.S. at 67-68. The plurality opinion did not define the scope of the parental right at issue in that case, and one common thread that runs through nearly all of the six opinions written in the Troxel case is that the parental right with respect to visitation decisions remained undefined. See id. at 73 ("We do not, and need not, define today the precise scope of the parental due process right in the visitation context."); id. at 78 (Souter, J., concurring) ("Our cases, it is true, have not set out exact metes and bounds to the protected interest of a parent in the relationship with his child . . . ."); id. at 88 (Stevens, J., dissenting) ("While this Court has not yet had occasion to elucidate the nature of a child's liberty interests in preserving established familial or family-like bonds, it seems to me extremely likely that, to the extent parents and families have fundamental liberty interests in preserving such intimate relationships, so, too, do children have these interests, and so, too, must their interests be balanced in the equation." (citation omitted)); id. at 91-93 (Scalia, J., dissenting) (arguing that the constitution does not recognize the right of a parent to direct the upbringing of their children and indicating that he would not extend the theory of the cases

18

recognizing any such right "to this new context"); id. at at 100-01 (Kennedy, J., dissenting) ("In short, a fit parent's right vis-à-vis a complete stranger is one thing; another parent or a de facto parent may be another. The protection the Constitution requires, then, must be elaborated with care, using discipline and instruction of the case law system."). But see id. at (Thomas, J., dissenting) (arguing that "parents have a fundamental constitutional right to rear their children, including the right to determine who shall educate and socialize them"). Similarly, the scope of the parental right in the context of custody proceedings between a parent and a nonparent who has "de facto custody" of the child has not been defined by the Supreme Court.

The Supreme Court's cases regarding the interests of parents in the care, custody, and control of their children may be grouped into two categories: (1) cases involving a natural parent's right to parent a child and maintain the parent-child relationship[12] and (2) cases involving state interference with a

---

[12]    See Santosky v. Kramer, 455 U.S. 745, 768 (1982) (holding that a state's use of a "fair preponderance of the evidence" standard at a parental rights termination proceeding violated the Due Process Clause); Quilloin v. Walcott, 434 U.S. 246, 255 (1978) (holding that the natural father's substantive due process rights were not violated by application of the "best interests of the child" standard where natural father had not previously sought actual or legal custody of child); Stanley v. Illinois, 405 U.S. 645, (1972) (holding that natural father "was entitled to a hearing on his fitness as a parent before his children were taken from him and that, by denying him a hearing and extending it to all other parents whose custody of their

(continued . . .)

19

parent's decision regarding the child.[13]  This case does not call into question the potential termination of B.B.'s parental rights, but rather, it involves B.B.'s right to determine who has custody and access to Child.  Because the Court did not define the parental right in Troxel, there are no Supreme Court opinions discussing circumstances analogous to this case.  See supra notes 12-13.[14]

---

children is challenged, the State denied [father] the equal protection of the laws guaranteed by the Fourteenth Amendment").

[13]     See Troxel, 530 U.S. at 67-68 (holding as facially unconstitutional a statute allowing any third party seeking visitation to subject any decision by a parent concerning visitation of the parent's children to state-court review); Wisconsin v. Yoder, 406 U.S. 205, 234 (1972) (holding that the First and Fourteenth Amendments prevented the State of Wisconsin from compelling Amish parents to "cause their children to attend formal high school at age 16"); Prince v. Massachusetts, 321 U.S. 158, 443-44 (1944) (holding that a state statute prohibiting children from distributing magazines on the street did not violate child's First Amendment rights or child's custodian's First and Fourteenth Amendment rights to give child religious training); Pierce v. Soc'y of the Sisters, 268 U.S. 510, 535 (1925) (holding that a state statute requiring children to attend public school "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control"); see also Parham v. J. R., 442 U.S. 584, 603 (1979) (holding that a state statute, which allowed voluntary admission of minor children to mental hospitals by parents or guardians, did not per se violate the children's substantive due process rights).

[14]     The Massachusetts Supreme Court observed that the following principles clearly emerged from the Troxel plurality decision:

>     (i) reaffirmation that a parent's liberty interest in child rearing is indeed fundamental, and is certainly fundamental in this context;
>
>     (ii) "any third party" should not be permitted to seek visitation;
>
>     (iii) in determining whether grandparent visitation should occur, there exists a "presumption that a fit parent will act in the best interest of his or her child," and the decision of a fit parent concerning grandparent visitation is entitled to considerable deference; and

(continued . . .)

In Doe, this court considered the constitutionality of a statute allowing for any grandparent residing in the same state of their grandchild to petition for visitation and allowing the court to grant the petition so long as it was in the best interests of the child.[15]   116 Hawai‘i at 325, 172 P.3d at 1069.  Applying strict scrutiny, the court concluded that "proper recognition of parental autonomy in child-rearing decisions requires that the party petitioning for visitation demonstrate that the child will suffer significant harm in the absence of visitation before the family court may consider what degree of visitation is in the child's best interests."  Id. at 335-36, 172 P.3d at 1079-80.  Accordingly, the court held that the statute was facially unconstitutional because it did not include the "harm to the child" standard required by the right to privacy under the Hawai‘i Constitution.[16]  Id. at 336; 172 P.3d

---

(iv) in determining whether grandparent visitation should occur, the potential impact to the parent-child relationship should be considered.

Blixt v. Blixt, 774 N.E.2d 1052, 1058-59 (Mass. 2002) (citations omitted) (quoting Troxel, 530 U.S. at 67, 69).

[15]     The court also suggested that the statute was not facially unconstitutional under the Due Process Clause of the Fourteenth Amendment. See Doe, 116 Hawai‘i at 333, 172 P.3d at 1077 (concluding that the grandparent visitation statute "comport[ed] with the limited requirements expressed in Troxel").

[16]     Doe ruled that the statute was unconstitutional under article I, section 6 of the Hawai‘i Constitution only.  See 116 Hawai‘i at 335-36, 172 P.3d at 1079-80.

at 1080.  Thus, a parent's fundamental right to direct the upbringing of his or her child was implicated "where a nonparent third party petitione[d] for visitation," and the State could not interfere with the parent's decision absent a finding that the parent's decision to deny access to the child would result in harm to the child.  Id.

Subsequently, the ICA considered whether the application of the doctrine of equitable estoppel in a custody proceeding infringed on a mother's parental rights.  See Inoue v. Inoue, 118 Hawai'i 86, 101, 185 P.3d 834, 849 (App.), cert. denied, 118 Hawai'i 194, 186 P.3d 629 (2008).  In Inoue, the family court equitably estopped the biological mother of a child from denying that her husband was the father of her child for the purposes of determining custody.  Id. at 88, 185 P.3d at 836.  The mother and her husband in Inoue met when she was pregnant with the child.  Id. at 88-89, 185 P.3d at 836-37.  The mother did not identify any father on the child's original birth certificate, but at some point after the birth of the child, the child's birth certificate was changed to reflect the husband as the child's father.  Id. at 89, 185 P.3d at 837.  The mother and husband were subsequently married, had two additional children, and lived together as a family until their separation seven years later.  Id.  The family court in Inoue awarded husband sole legal and physical custody of all three children, while

22

granting mother visitation rights. Id. at 91, 185 P.3d at 839. The mother appealed the family court's decision to the ICA arguing that the family court could not award husband custody of the oldest child because he was not the child's legal father and she was not unfit. Id. at 92, 185 P.3d at 840.

The ICA concluded that the family court did not err in holding that the husband was the legal father of the child under Hawaii's presumption of paternity statute and that the mother was estopped from challenging her husband's parentage of the child. Id. at 94, 185 P.3d at 842. The ICA also considered whether the application of the doctrine of equitable estoppel infringed on the mother's parental rights under a plain error standard of review. Id. at 99-101, 185 P.3d at 847-49. The ICA concluded that the application of the doctrine of equitable estoppel did not infringe on the mother's liberty interests because she voluntarily rendered her parental rights with respect to the child "less exclusive and less exclusory" with regard to her husband. Id. at 101, 185 P.3d at 849 (quoting Rubano v. DiCenzo, 759 A.2d 959, 976 (R.I. 2000)). The ICA reasoned,

> By marrying Egan and then adding his name to Child One's birth certificate, Gina created the circumstances under which Egan became Child One's "legal father." By representing to him that he had adopted Child One when he allowed his name to be added to the certificate, Gina led Egan to take no action to further investigate or establish his status as Child One's father. Finally, Gina allowed Egan to assume the role of Child One's father and to become Child One's psychological parent.

23

Id. at 100-01, 185 P.3d at 848-49 (footnote omitted).

Inoue relied on the Rhode Island Supreme Court's decision in Rubano, which concerned two women who agreed to become the parents of a child. 759 A.2d at 961. They arranged for one of them to conceive via artificial insemination, and they raised the child together for four years while living together as a family in Massachusetts. Id. They gave the child both of their last names separated by a hyphen on the child's birth certificate and sent out printed birth announcements identifying both of them as the child's parents, although the parental status was never legally settled by adoption. Id. When the couple separated, the biological mother took the child with her to Rhode Island, and, initially, the biological mother agreed to a visitation schedule for her former partner to see the child. Id. at 961. Later, when the biological mother was resistant to the visitation arrangements, the former partner initiated legal proceedings seeking to establish her de facto parental status and obtain court-ordered visitation. Id. at 961-62. The parties negotiated a compromise that was embodied in a consent order, specifying that the former partner would have permanent visitation with the child on a periodic basis in exchange for waiving any claim to parent the child. Id. at 962. In later proceedings, the biological mother asserted that the court lacked jurisdiction to enter the consent order. Id.

The Supreme Court of Rhode Island considered whether the biological mother had a protected liberty interest under the Due Process Clause of the Fourteenth Amendment to terminate the relationship between her former partner and child.  The Rhode Island court concluded that the biological mother rendered her own parental rights with respect to her child "less exclusive and less exclusory" than they otherwise would have been had she not "by word and deed" allowed her former partner to establish a parental bond with the child and also agreed to allow visitation.  Id. at 976.  The court reasoned that "the mere fact of biological parenthood, even when coupled with the biological parent's ongoing care and nurture of the child and that parent's fundamental right . . . , does not always endow the biological parent with the absolute right to prevent all third parties from ever acquiring any parental rights vis-à-vis the child."  Id.

The Inoue and Rubano decisions are consistent with the United States Supreme Court's cases defining the parental liberty interest.  Constitutionally protected parental rights are not based solely on legal or biological ties, and the Supreme Court has recognized "that the rights of the parents are a counterpart of the responsibilities they have assumed."  Lehr, 463 U.S. at 257.  Stated another way, "A parent's rights with respect to her child have thus never been regarded as absolute, but rather are limited by the existence of an actual, developed

25

relationship with a child, and are tied to the presence or absence of some embodiment of family." Troxel, 530 U.S. at 88 (Stevens, J., dissenting). The Supreme Court has recognized that "[t]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot[ing] a way of life' through the instruction of children as well as from the fact of blood relationship.'" Lehr, 463 U.S. at 261 (second alteration in original) (quoting Smith v. Org. of Foster Families for Equality & Reform, 431 U.S. 816, 844 (1977)); see also Quilloin v. Walcott, 434 U.S. 246, 255 (1978) (holding that "best interests of the child standard" did not violate a natural father's parental rights in adoption proceedings that terminated his parental rights where natural father did not marry the mother and had not at any time sought actual or legal custody of his child).

The scope of parental rights is also defined in reference to the State's authority and duty to protect children in addition to the rights of children. See Troxel, 530 U.S. at 88 (Stevens, J., dissenting) (observing that limitations on parental rights "have arisen, not simply out of the definition of parenthood itself, but because of [the Supreme Court's] assumption that a parent's interests in a child must be balanced

against the State's long-recognized interests as parens patriae and, critically, the child's own complementary interest in preserving relationships that serve her welfare and protection" (citations omitted)).  Indeed, with regard to the Troxel decision, a majority of the court contemplated that even where the parent has a developed, legal parent-child relationship with the child, there may be special factors that justify state interference.  See Troxel, 530 U.S. at 68, 73 (plurality) (declining to define the precise scope of the parental due process right, relying instead on the "sweeping breadth" of the statute and application of "broad, unlimited power," and noting the absence of "special factors that might justify the State's interference"); id. at 89 (Stevens, J., dissenting) ("The constitutional protection against arbitrary state interference with parental rights should not be extended to prevent the States from protecting children against the arbitrary exercise of parental authority that is not in fact motivated by an interest in the welfare of the child."); id. at 99 (Kennedy, J., dissenting) ("In the design and elaboration of their visitation laws, States may be entitled to consider that certain relationships are such that to avoid the risk of harm, a best interests standard can be employed by their domestic relations courts in some circumstances."); cf. id. at 92 (Scalia, J.,

dissenting) (stating that he would not extend the theory of parental rights to extend to visitation decisions).

Relying on the plurality in Michael H. v. Gerald D., 491 U.S. 110 (1989), the Rhode Island Supreme Court noted that "under certain circumstances, even the existence of a developed biological parent-child relationship . . . will not prevent others from acquiring parental rights vis-à-vis the child." Rubano, 759 A.2d at 974; see also Troxel, 530 U.S. at 87-88 (Stevens, J., dissenting) (discussing Michael H.).  Indeed, as Justice Kennedy stated in his dissenting opinion in Troxel, "Cases are sure to arise--perhaps a substantial number of cases--in which a third party, by acting in a caregiving role over a significant period of time, has developed a relationship with a child which is not necessarily subject to absolute parental veto."  530 U.S. at 98 (Kennedy, J., dissenting) (citing Michael H., Quillon, and Lehr); see also id. at 64 (plurality) ("[P]ersons outside the nuclear family are called upon with increasing frequency to assist in the everyday tasks of child rearing.").  Accordingly, "a fit parent's right vis-à-vis a complete stranger is one thing; her right vis-à-vis another parent or a de facto parent may be another."  Id. at 100-101 (Kennedy, J., dissenting).

In this case, the parties made a joint decision to adopt and raise Child.  Together, the parties named Child,

giving her each of their last names, and they lived together with B.B.'s teenage son as a family unit for a two-year period. From the time she could talk, Child referred to B.B. as "Papa" and A.A. as "Daddy," and they jointly shared all parental care, duties, and responsibilities for Child from the time she was one month old. Although A.A. and B.B. intended that A.A. would adopt Child and retained an attorney to accomplish the adoption, the adoption never occurred. Additionally, following their separation, the parties continued to attend counseling together and entered into a 50/50 written co-parenting agreement. Accordingly, it appears from the family court's findings that B.B. voluntarily incorporated A.A. into the family unit and encouraged him to share parental responsibilities and custody of Child.

As the mother in Inoue facilitated the "circumstances under which [her husband] became [her oldest child's] 'legal father,'" B.B. voluntarily shared custody of Child with A.A. and, thus, made his own parental rights less exclusive vis-à-vis A.A. See Inoue, 118 Hawai'i at 101, 185 P.3d at 849; see also 530 U.S. at 98 (Kennedy, J., dissenting) ("[A] fit parent's right vis-à-vis a complete stranger is one thing; her right vis-

à-vis another parent or a de facto parent may be another.").[17]
The circumstances of this case are entirely distinguishable from
those governed by the grandparent visitation statute considered
in Doe.  See 116 Hawai'i at 325, 172 P.3d at 1069.  In this case,
B.B. voluntarily allowed A.A. to share physical custody of Child
in addition to sharing the duties and responsibilities for
parenting child, and thus the circumstances do not implicate the

---

[17]    Cf. Smith v. Guest, 16 A.3d 920, 931 (Del. 2011) (holding that de
facto parent statute did not violate the due process rights of child's other
legal parent because a de facto parent would also be a "legal 'parent'" that
would share a "co-equal 'fundamental parental interest'" in raising the child
with the other parent); C.E.W. v. D.E.W., 845 A.2d 1146, 1152 (Me. 2004)
(holding that person's status as the de facto parent of a child authorized
the court to consider an award of parental rights and responsibilities to the
person as a parent based on its determination of the best interest of the
child); Rubano, 759 A.2d at 974 ("[U]nder certain circumstances, even the
existence of a developed biological parent-child relationship . . . will not
prevent others from acquiring parental rights vis-à-vis the child."); Brooke
S.B. v. Elizabeth A. C.C., No. 91, 2016 WL 4507780 (N.Y. Aug. 30, 2016)
(expanding the definition of "parent" to include a partner of a domestic
partnership that agrees to conceive a child and to raise the child together);
In re Parentage of L.B., 122 P.3d 161, 177 (Wash. 2005) ("We thus hold that
henceforth in Washington, a de facto parent stands in legal parity with an
otherwise legal parent, whether biological, adoptive, or otherwise."); In re
Custody of B.M.H., 315 P.3d 470, 478 (Wash. 2013) (en banc) ("The de facto
parentage doctrine incorporates constitutionally required deference to
parents by requiring that the biological or legal parent consent to and
foster the parentlike relationship. Once a petitioner has made the threshold
showing that the natural or legal parent consented to and fostered the
parent-like relationship, the State is no longer 'interfering on behalf of a
third party in an insular family unit but is enforcing the rights and
obligations of parenthood that attach to de facto parents.'" (quoting In re
Parentage of L.B., 122 P.3d 161 (Wash. 2005) (en banc))); Randy A.J. v. Norma
I.J., 655 N.W.2d 195, 201 (Wis. 2002) (noting that under Wisconsin's
equitable parent doctrine, "[o]nce a court determines that a party is an
equitable parent, there is no distinction between the equitable parent and
any other parent; each is endowed with the same rights and responsibilities
of parenthood"), aff'd, 677 N.W.2d 630.

Hawai'i Constitution's right to privacy as the grandparent statute in Doe did.[18]

Additionally, we cannot conclude that B.B. has established the statute is facially unconstitutional. See United States v. Salerno, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). The de facto custody provision of HRS § 571-46(a)(2) simply does not have the broad sweep that the grandparent visitation statute in Doe had. Indeed, HRS § 571-46(a)(2) is one of several "standards, considerations, and procedures" that HRS § 571-46 provides for family courts tasked with handling custody and visitation disputes; it is but one tool in a court's toolbox for navigating the varying and complex circumstances that may arise when custody to a child is in dispute. Additionally, HRS § 571-46 includes subsection (a)(1), which provides custody should be awarded to either parent or to both parents according to the best interests of the child, and

---

[18] Our decision is based on the circumstances presented by this case. We note that a parent does not relinquish his or her parental rights by merely relying on childcare assistance from others. As stated, de facto custody is not established by mere physical custody of a child. Nonetheless, we decline to adopt a bright line rule regarding the extent of a parent's protected liberty interest as "the constitutional protections in this area are best 'elaborated with care'" on a case-by-case basis. See Troxel, 530 U.S. at 73 (plurality) (quoting id. at 101 (Kennedy, J., dissenting)).

importantly, HRS § 571-46(a)(2) may also apply under circumstances where no parent or no fit parent seeks custody of the child. HRS § 571-46 is therefore notably distinguishable from the grandparent visitation statute in Doe. Indeed, the apparent purpose of the statute in Doe was to provide grandparents a means to circumvent the decisions of parents based on the legislature's finding that "grandparents play a significant role in the lives of minor children and should be allowed reasonable visitation rights so long as it is in the best interests of the child." Doe, 116 Hawai'i at 332 n.6, 172 P.3d at 1076 n.6 (quoting Sen. Stand. Comm. Rep. No. 1053, in 1993 Senate Journal, at 1154). The grandparent visitation statute was facially invalid as it undermined a parent's judgment to not allow grandparents access to one's child based merely on a finding that grandparent visitation was in the child's best interests. Id. ("Indeed, there can be no doubt that the legislature intended that visitation, if found by a court to be in the best interests of the child, may be ordered over a parent's objection"); see Troxel, 530 U.S. 57, 67, 120 S. Ct. 2054, 2061, 147 L. Ed. 2d 49 (2000) ("[I]n practical effect, in the State of Washington a court can disregard and overturn any decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the judge's determination

of the child's best interests."). While there certainly may be situations where a family court's application of HRS § 571-46(a)(2) may violate a parent's constitutionally protected liberty interests, we do not conclude that the statute is facially invalid as the grandparent visitation statute in Doe was.

In distinguishing Inoue, the family court placed great emphasis on the fact that the parties never married or entered into a civil union. While it is true that the Inoue opinion discusses the fact that the parties were married in its analysis, it was important only because marriage was relevant to the paternity statute that was specifically challenged by the mother in Inoue.[19] See Inoue, 118 Hawai'i at 94, 185 P.3d at 842. In that case, the biological mother's husband and the child had a presumptive "parent child relationship" pursuant to HRS § 584-4(a)(3)(B) because of the subsequent marriage of the parties and

_____

[19] HRS § 584-4(a)(3)(B) (2006) provides,

A man is presumed to be the natural father of a child if:

. . .

After the child's birth, he and the child's natural mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and:

. . .

With his consent, he is named as the child's father on the child's birth certificate . . . .

inclusion of husband on the birth certificate. Id. Thus,

marriage was an essential element of the statute challenged by

the mother in Inoue, and her voluntary creation of the

circumstances giving rise to the presumptive parent-child

relationship was important to the ICA, not the existence of a

marriage itself. See id. at 100, 185 P.3d at 848. Indeed,

Inoue found the reasoning of the Rubano case persuasive, see

id., although the parties were not married and the relationship

of the parties was not discussed as an essential fact. See

Rubano, 759 A.2d at 976. The heart of the Rubano decision

concerned the relationship of the parties with the child--not

the relationship between the parties. See id. at 974. In any

event, marriage is not an element of the de facto presumption of

HRS § 571-46(a)(2), the provision on which A.A. bases his claim

for joint custody of Child.[20]

---

[20] Application of the family court's marriage requirement would mean that a grandparent or other family member, such as a hānai parent, would never be able to establish a de facto custodial relationship with a child so long as the biological parent remains in the child's life, even where the child views the third party as his or her only parental figure.

By extension, we do not agree with B.B.'s contention that application of the de facto custody provision would create significant burdens that would apply to all domestic relationships where a single parent is involved as this is not a case where the parties simply lived together with a child. See State v. Sturch, 82 Hawai'i 269, 274, 921 P.2d 1170, 1175 (App. 1996) ("A person to whom a statute may be constitutionally applied cannot challenge the statute on the ground that it may conceivably be applied unconstitutionally to others." (quoting State v. Kaneakua, 61 Haw. 136, 143, 597 P.2d 590, 594 (1979)). Indeed, we do not believe a person would be considered a "proper" person to have custody of the child under HRS § 571-46(a)(2) where the person's sole connection to the child is a relationship with the parent. Additionally, we note that living in a household with a

(continued . . .)

Therefore, because B.B. permitted A.A. to share physical custody of Child in addition to the parenting responsibilities and duties with regard to Child, B.B. does not have a protected privacy interest in excluding A.A. from Child's life under the Due Process Clause of the Fourteenth Amendment or the Hawai'i Constitution's due process and privacy protections. As such, B.B. has not demonstrated that the application of HRS § 571-46(a)(2) under the circumstances of this case would implicate his parental rights protected under the federal or Hawai'i constitutions.

Given B.B. has not established that HRS § 571-46(a)(2) impacted a protected liberty interest nor a privacy interest under the Hawai'i Constitution, the statute's prima facie de facto provision, which includes the best interests of the child standard, satisfies due process. See HRS § 571-46(a)(2). Indeed, HRS § 571-46(a)(2) provides B.B. with ample protections as he has not demonstrated the implication of a protected liberty interest. HRS § 571-46(a)(1) favors the awarding of custody to the child's parents, providing that custody "should be awarded to either or both parents," and it also provides for

---

child is not equivalent to having custody of a child although it may be relevant to the issue.

Additionally, B.B.'s contention that the absence of a legal financial responsibility upon A.A. to support Child renders him ineligible to be awarded custody is unsupported by HRS § 571-46(a)(2).

the maintenance of meaningful contact between the parent and child unless the parent "is unable to act in the best interest of the child." HRS § 571-46(a)(2) states that custody "may" be awarded to a person who is not a parent "whenever the award serves the best interest of the child," and it also creates a presumption in favor of awarding custody under limited circumstances to a person who has de facto custody. Accordingly, the de facto presumption, which is also subject to the best interests of the child standard, would only apply when the nonparent custodian is able to demonstrate that he or she (1) has had "de facto custody" of the child (2) in a stable and wholesome home and that (3) the custodian is a fit and proper person. Given that no protected liberty interest is demonstrated by B.B., the statute satisfies due process as applied in this case.[21] B.B. has therefore not established that an award of custody to A.A. under HRS § 571-46(a)(2) would

---

[21] The adequacy of the statute is evaluated in reference to whether a significant liberty interest is implicated. See Guidry, 105 Hawai'i at 227, 96 P.3d at 247; see also Lehr, 463 U.S. at 256. The Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." Troxel, 530 U.S. at 65 (plurality). As we conclude that B.B.'s fundamental parental rights are not implicated under the circumstances of this case, we need not apply a heightened scrutiny in evaluating whether HRS § 571-46(a)(2) satisfies due process. Cf. Doe, 116 Hawai'i at 335, 172 P.3d at 1079 (applying strict scrutiny in determining that grandparent visitation statute was facially unconstitutional under the Hawai'i Constitution's right to privacy).

impair his parental rights under the federal or Hawai'i constitutions.[22]

### III. CONCLUSION

For the reasons discussed, the family court misapprehended the law when it required A.A. to establish that the application of HRS § 571-46(a)(2) would be constitutional if applied to his request for joint custody of Child. The plain language of HRS § 571-46(a)(2) contemplates standing to seek custody when a person has had "de facto custody" of a child and meets the other requirements of HRS § 571-46(a)(2). Further, we hold that B.B. failed to establish that the application of HRS § 571-46(a)(2) to this case would infringe on his fundamental liberty interests or otherwise violate his right to privacy under the Hawai'i Constitution.[23] Accordingly, we remand the case

---

[22] Although it is not necessary to address in this case, it is noted that the State has a compelling state interest in maintaining the presence of a child in a stable and wholesome home with fit and proper persons. The State's compelling interest and duty with regard to the welfare of children has long been recognized in this jurisdiction. See In re Guardianship of Thompson, 32 Haw. 479, 486 (1932). In addition, HRS § 571-46(a)(2) protects the interests and rights of children. See Troxel, 530 U.S. at 89 n.9 (collecting cases demonstrating that children have constitutionally protected rights).

[23] We reject A.A.'s evidentiary challenges to the expert testimony presented at the hearing. Given her education and experience, Dr. De Costa was qualified to testify as an expert in the field of family behaviors and in the relationship of children with their families. See HRS § 571-46(a)(5) (providing that the court may decide that qualified "expert's testimony is relevant to a just and reasonable determination of what is for the best physical, mental, moral, and spiritual well-being of the child whose custody is at issue"). The hypothetical opinion elicited from Dr. De Costa was admissible under Hawai'i Rule of Evidence (HRE) Rule 703. See HRE Rule 703 cmt (1993). Dr. De Costa's opinions regarding the potential harm to Child as

(continued . . .)

for proper application of HRS § 571-46(a)(2), including a determination as to whether A.A. satisfies the three elements of HRS § 571-46(a)(2) and, if so, for a custody award in Child's best interests.

Accordingly, the family court's December 11, 2014 "Findings of Fact, Conclusions of Law; Order/Final Judgment" is vacated, and the case is remanded to the family court for further proceedings consistent with this opinion.

| | |
|---|---|
| Michael S. Zola<br>for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Brian J. De Lima,<br>Francis R. Alcain and<br>Justin P. Haspe<br>for respondent | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |



---

a result of the termination of the relationship between A.A. and B.B. and the doctor's concerns about Child having a continued relationship with A.A. were relevant, within the doctor's expertise, and would assist the court in determining Child's best interests. See HRS § 571-46(a)(5). Dr. De Costa's testimony regarding the mental health of B.B.'s son, including her diagnosis, was admissible as a proper foundation was laid, and it was relevant to the court's consideration of the best interests of Child and whether A.A. was a fit and proper person for purposes of applying the de facto custody presumption of HRS § 571-46(a)(2). Dr. De Costa's testimony regarding B.B.'s son's test scores was admissible under HRE Rule 703 without their introduction into evidence. And, the family court's finding of fact regarding Dr. De Costa's testimony did not misstate her testimony and was supported by the record.

With regard to Dr. Wyss's testimony, it appears that the court considered the testimony of Dr. Wyss, but it found Dr. De Costa's testimony more compelling, which is within the province of the trial court. See Exotics Hawaii-Kona, Inc. v. E.I. Du Pont De Nemours & Co., 116 Hawai'i. 277, 299, 172 P.3d 1021, 1043 (2007). Lastly, any error by the family court in restricting Dr. Wyss's testimony to the contents of his report, or in not admitting his progress notes, was harmless because Dr. Wyss was permitted to testify that he was aware of the sex-abuse allegations against A.A. and that he did not believe that A.A. posed a threat of abuse to Child. However, if further evidentiary proceedings are held on remand, the family court may revisit its ruling regarding the proffered evidence.