**Electronically Filed
Intermediate Court of Appeals
CAAP-20-0000737
27-SEP-2021
08:02 AM
Dkt. 71 MO**

NO. CAAP-20-0000737

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

IN THE INTEREST OF IK, JK, SK, RK, and KK

APPEAL FROM THE FAMILY COURT OF THE FIFTH CIRCUIT
(FC-S NO. 18-00035)

MEMORANDUM OPINION
(By:  Ginoza, Chief Judge, Leonard and Nakasone, JJ.)

Respondent-Appellant Mother (**Mother**) appeals from the Decision and Order Terminating the Parental Rights of [Father] and [Mother] and Awarding Permanent Custody (**Termination Order**), entered December 8, 2020, in the Family Court of the Fifth Circuit (**Family Court**),[1] terminating her and Respondent Father's (**Father**)[2] (together, **Parents**) parental rights to IK, JK, SK, RK, and KK (**Children**).

On appeal, Mother raises four points of error, that the Family Court:  (1) clearly erred in entering findings of fact (**FOFs**) C, EE, and WW; (2) abused its discretion in entering mixed conclusions of law and findings of fact (**Mixed Conclusions and Findings**) RR, XX, and BBB; (3) abused its discretion in finding that there was clear and convincing evidence she was not presently, and would not be in the reasonably foreseeable future, willing and able to provide the Children a safe family home, even

---

[1]  The Honorable Edmund D. Acoba presided.

[2]  Father is not a party to this appeal.

with the assistance of a service plan; and (4) abused its discretion in terminating her parental rights.  Mother contends the Family Court prematurely terminated her parental rights given that:  she completed all services required by Petitioner-Appellee State of Hawaiʻi Department of Human Services (**DHS**), and her parental rights were terminated solely based on conflicting testimony as to whether she should have more time to terminate her "on and off relationship" with Father, who is abusive; and the September 30, 2020 Permanent Plan (**Permanent Plan**) is not in the Children's best interests as it has a goal of adoption by paternal grandparents (**Paternal Grandparents**), despite evidence that Father now resides with Paternal Grandparents.

For the reasons discussed below, we vacate the Termination Order and remand to the Family Court for further proceedings.

## I.  Applicable Standards

In addressing whether to terminate parental rights, the Family Court applies the standards set forth in Hawaiʻi Revised Statutes (**HRS**) § 587A-33 (2018), which provides in relevant part:

> (a) <u>At a termination of parental rights hearing, the court shall determine whether there exists clear and convincing evidence that</u>:
>
> (1)   A child's parent whose rights are subject to termination is not presently willing and able to provide the parent's child with a safe family home, even with the assistance of a service plan;
>
> (2)   It is not reasonably foreseeable that the child's parent whose rights are subject to termination will become willing and able to provide the child with a safe family home, even with the assistance of a service plan, within a reasonable period of time, which shall not exceed two years from the child's date of entry into foster care;
>
> (3)   The proposed permanent plan is in the best interests of the child.  In reaching this determination, the court shall:
>
> > (A)   Presume that it is in the best interests of the child to be promptly and permanently placed with responsible and competent substitute parents and family in a safe and secure home; and

2

(B)    Give greater weight to the presumption that the
permanent plan is in the child's best interest,
the younger the child is upon the child's date
of entry into foster care; and

(4)    The child consents to the permanent plan if the child is at
least fourteen years old, unless the court consults with the
child in camera and finds that it is in the best interest of
the child to proceed without the child's consent.

(b)    If the court determines that the criteria set forth in
subsection (a) are established by clear and convincing
evidence and the goal of the permanent plan is for the child
to be adopted or remain in permanent custody, the court
shall order:

(1)    That the child's parent's parental rights be terminated;

(2)    Termination of the existing service plan and revocation of
the prior award of foster custody;

(3)    That permanent custody of the child be awarded to an
appropriate authorized agency;

(4)    An appropriate permanent plan; and

(5)    The entry of any other orders the court deems to be in
the best interests of the child, including restricting
or excluding unnecessary parties from participating in
adoption or other subsequent proceedings.

. . . .

(h)    If the court determines that the criteria set forth in
subsection (a) are **not** established by clear and convincing
evidence, the court shall order:

(1)    The preparation of a plan to achieve permanency for
the child;

(2)    The entry of any orders that the court deems to be in
the best interests of the child;

(3)    A periodic review hearing to be held within six months
after the date of the last permanency hearing; and

(4)    A permanency hearing to be held within twelve months
of the date of the last permanency hearing.

(Emphases added).

"Clear and convincing" evidence is defined as

an intermediate standard of proof greater than a
preponderance of the evidence, but less than proof
beyond a reasonable doubt required in criminal cases.
It is that degree of proof which will produce in the
mind of the trier of fact a firm belief or conviction
as to the allegations sought to be established, and
requires the existence of a fact be highly probable.

3

Iddings v. Mee-Lee, 82 Hawaiʻi 1, 13, 919 P.2d 263, 275 (1996).

> [T]he family court's determinations . . . with respect to (1) whether a child's parent is willing and able to provide a safe family home for the child and (2) whether it is reasonably foreseeable that a child's parent will become willing and able to provide a safe family home within a reasonable period of time present mixed questions of law and fact; thus, inasmuch as the family court's determinations in this regard are dependant upon the facts and circumstances of each case, they are reviewed on appeal under the clearly erroneous standard.  Likewise, the family court's determination of what is or is not in a child's best interests is reviewed on appeal for clear error.
>
> Moreover, the family court is given much leeway in its examination of the reports concerning a child's care, custody, and welfare, and its conclusions in this regard, if supported by the record and not clearly erroneous, must stand on appeal.

In re Doe, 95 Hawaiʻi 183, 190, 20 P.3d 616, 623 (2001) (citations, quotation marks, and brackets omitted).

> The family court's FOFs are reviewed on appeal under the clearly erroneous standard.  A FOF is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made.  Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

Id. (citations, quotation marks, and ellipsis omitted).

## II.  Background

The Family Court made a number of findings, only some of which Mother challenges in this appeal.  To the extent Mother does not challenge findings by the Family Court, we are bound by those findings.  Bremer v. Weeks, 104 Hawaiʻi 43, 63, 85 P.3d 150, 170 (2004); Okada Trucking Co., Ltd. v. Bd. of Water Supply, 97 Hawaiʻi 450, 458, 40 P.3d 73, 81 (2002) ("[f]indings of fact . . . that are not challenged on appeal are binding on the appellate court.").

To provide context for Mother's appeal, we set out most of the Family Court's findings and conclusions in its Termination

4

Order, filed on December 8, 2020, and we bold the items challenged by Mother in this appeal.

A    The child/ren's mother, legal father, adjudicated, presumed, or concerned natural father, as defined under HRS Chapter 578, is/are not presently willing and able to provide the child/ren with a safe family home, even with the assistance of a service plan;

B    It is not reasonably foreseeable that the child/ren's mother, legal father, adjudicated, presumed or concerned natural father, as defined under HRS Chapter 578, will become willing and able to provide the child/ren with a safe family home, within a reasonable period of time;

**C    Despite the reasonable efforts made by the Department of Human Services to have the parents resolve their substance abuse and domestic violence issues, parents have failed to do so;**

D    The [Father] has not appeared in court nor has he engaged in a service plan, he has been defaulted for his failure to appear;

E    The [Mother] had made some progress in demonstrating that she could be a protective parent when she temporarily ended her relationship with [Father] and sought a protective order against him;

F    Although Mother recognized that her relationship with father was toxic and the domestic violence the children experienced traumatized them, she made the decision to set aside any temporary retaining orders and engaged in an "on-again -- off-again" relationship with father;

G    On November 7, 2018, [RK, then 2 years, 7 months old] and [KK, then 1 year, seven months old] were found alone, in the neighbors yard and the police were called, Mother arrived while the police were investigating and refused to divulge the location of her older three children, [RK] and [KK] were removed from her care;

H    The older three children, [IK], [JK] and [SK] were located later in the day on November 7, 2018, in the care of [Paternal Grandparents], protective custody was taken and they remained with [Paternal Grandparents] as Resource Caregiver/Grandparents;

I    In the October 2019 Ohana Conference, Father committed to working with the DHS on the Family Service Plan;

J    In October 2019; [KK] had a near drowning incident while on a visit with Mother to the beach, he was evacuated to Kapiolani Children's Hospital for treatment and care;

K    Mother and Father both went to Kapiolani Children's Hospital to be with him as he was being treated, a domestic violence incident between Mother and Father occurred at Hospital and he had to be forcibly removed;

L     On October 14, 2019, Father met with DHS SW Karen Morrison and discussed the FSP, and he was referred for a Substance Abuse Assessment and random Urinalysis testing, he failed to participate in both;

M     Mother completed Substance Abuse Treatment as required by the Family Service Plan;

N     Mother had a laboratory confirmed test for Methamphetamines on February 6, 2020 at 28 ng/ml, the cutoff limit is 25 ng/ml;

O     Mother tested presumptive positive for Methamphetamines on February 18, 2020, and the result was confirmed by laboratory testing at 32 ng/ml on February 21, 2020, the cutoff limit is 25 ng/ml;

P     Mother tested presumptive positive for Methamphetamines on February 24,2020;

Q     Mother had allowed Father to stay with her at the apartment she shared with her Mother, but lost her housing in February 2020;

R     After losing her housing in February 2020, Mother and Father began living out of their car and camping together for a month;

S     On July 30, 2020, Mother testified that she and Father fought on March 9, 2020, and she left him and entered the family violence shelter at the YWCA and remained for 45 days;

T     The March 24, 2020, Safe Family Home Report of SW Karen Morrison states that Mother and Father have made attempts to reconcile as a couple, and that this was concerning because Father had not engaged in substance abuse or domestic violence treatment;

U     Mother and Father would frequently argue, and end up in a physical altercation, and afterward Mother would meet with SW Morrison and state that she "is really done this time(,)" and after several weeks passed Mother and Father would reconcile their relationship;

V     Throughout the timeline of this case, [Father] and [Mother] have had a periodic on and off romantic relationship;

W     Parents have a long history of domestic violence issues, and Mother acknowledges that the children have been traumatized by witnessing the domestic violence;

X     Mother has failed to consistently protect her children from exposure to their parents domestic violence, and has failed [sic] prioritize the need to protect her children over maintaining her romantic relationship with Father;

Y     Mother went to live at the YWCA Family Violence Shelter, and applied for a Temporary Restraining Order against Father on April 15, 2020;

6

Z     Mother left the YWCA Shelter and moved into KEO transitional housing on April 27, 2020 and has a one year lease;

AA     On June 4, 2020, the DHS SW and GAL met with Mother regarding the way the TRO demonstrated her protectiveness, and that she needed to be fully compliant with the TRO and Mother agreed to comply with the TRO and other protective measures;

BB     On June 26, 2020, Mother filed a motion to withdraw the TRO against Father, she dropped the TRO without consulting with her therapist, the DHS and the GAL;

CC     Mother testified on July 30, 2020, that she dropped the TRO against father because it was not necessary, because she had not spoken to him since March 2020, and also because she was also frustrated with the Court process of getting him served with the TRO;

DD     Mother's [sic] testified that she struggles with an addiction to Father, and that in therapy she was working on her codependent choices, and that she was working on herself, but had not discussed with therapist why she repeatedly returned to Father;

**EE     Mother testified on July 30, 2020, that she was not in a relationship with Father, and therefore their domestic violence issues had no current effect on the children**;

FF     Mother further testified on July 30, 2020, that she could not imagine a relationship with Father and that she was on her own path working and doing therapy, and that she was not going to let him on her path;

GG     On September 24, 2020, Mother admitted under cross examination that she and Father had engaged in sexual relations in August 2020, inside the Resource Caregivers home, and were caught in [sic] act in the children's bedroom when the Resource Mother unexpectedly returned home;

HH     Closing argument of Mother was filed on September 29, 2020;

II     Closing argument of the DHS was filed September 30, 2020;

JJ     Mother's Motion to reopen trial was filed on October 7, 2020;

KK     Mother's Exhibit H "TRO in FCDA 20-1-0188, granted by the Court and filed on October 7, 2020" was received into evidence by the Court on October 15, 2020;

LL     Mother and Father agreed to meet on October 5, 2020, and engaged in sexual relation in a car parked in the yard of the resource home, while four of the children were asleep inside the house;

MM     Afer having sex, they argued about Father's drug use and a physical fight, which resulted in yelling and

7

screaming and the resource caregivers waking up and coming outside to confront the couple, Father ran away and Mother called the police;

NN    The Court takes judicial notice of the records and files in FCDA 20-1-0188 [Mother] v.[Father];

OO    Supplemental Closing argument was filed on October 19, 2020[;]

PP    On November 24, 2020, the Court circulated via email a memorandum to counsels with the Decision and Order of the Court Terminating the Parental Rights of [Mother] and [Father];

QQ    On November 30, 2020, Mother filed her notice of appeal in the Intermediate Court of Appeals, in CAAP-20-0000737;

**RR    The proposed permanent plan/s are in the best interest of the child/ren**;

SS    The child(ren)'s date of entry into foster custody was Jan. 24, 2019;

TT    The minor/s has/have been in out-of-home care for over twenty-three (23) of the last 22 (twenty-two) months [sic];

UU    Under the circumstances that are presented in this case, DHS has made reasonable efforts to finalize the permanency plan which in this case is [ ] reunification [X] permanent out of home placement;

VV    Each term, condition and consequence of the [ ] family service plan [X] permanent plan/s # dated September 30, 2020 [ ] as modified, has been explained to and is understood by each party present at the hearing;

**WW    The parties have not made progress toward resolving the problems that necessitated placement**;

**XX    The appropriate permanency goal for the child(ren) is: [ ] reunification [X] permanent out of home placement**;

YY    The projected date for [ ] reunification [X] adoption [ ] legal guardianship [ ] permanent custody is Dec. 2020;

ZZ    The child(ren) have been consulted, in an age of appropriate manner, about the proposed permanency and/or transition goal:

AAA    DHS has made reasonable efforts to:

    (A)    Place siblings in foster care with the same resource family, adoptive placement, or legal guardians, and
    (B)    Provide for frequent visitation or other on-going interactions with siblings who are not living in the same household;

**BBB    The child(ren)'s placement is safe and appropriate**;

8

> . . .
>
> <u>CCC</u>   The parents have failed to complete the goals and objectives of the family service plan within a reasonable amount of time;
>
> <u>DDD</u>   The current resource family was given actual notice of this hearing [ ] by written notice [X] when they were present at the last court hearing;
>
> . . .
>
> <u>EEE</u>   The matter came on for initial termination of parental rights (tpr) hearing on July 2, 2020 (with State's Exhibit/s #24-26 received by the Court) and was further continued to July 30, 2020;
>
> <u>FFF</u>   The matter came on for continued termination of parental rights (tpr) hearing on July 30, 2020 and was further continued to Sept. 24, 2020 with written closing arguments due on Oct. 2, 2020 followed by rebuttal/s due on Oct. 14, 2020 and closing supplemental due on Oct. 19, 2020[.]

(Emphases added).

Based on these findings and conclusions, the Family Court, *inter alia*: terminated the parental rights of Mother and Father; awarded DHS permanent custody under HRS § 587A-33(f) with the authority to place the Children for adoption or guardianship or long-term foster custody; made Paternal Grandparents parties to the proceeding and appointed them foster parents; and stated that each term of the September 30, 2020 Permanent Plan was "hereby ordered by the Court," and made them a part of the Termination Order.

### III.  Discussion

### A.  FOFs C, EE and WW

As set out in unchallenged FOF SS, the Children entered foster custody on January 24, 2019.  Over the course of almost two years, and after a number of hearings and multiple days of trial on the petition to terminate parental rights, the Family Court issued its initial written decision terminating Mother and Father's parental rights on November 24, 2020.  The Family Court thereafter issued the Termination Order on December 8, 2020.  We first address Mother's challenges to FOFs C, EE and WW.

**FOF C** provides as follows:  "Despite the reasonable efforts made by [DHS] to have the parents resolve their substance abuse and domestic violence issues, parents have failed to do so[.]"  Mother contends FOF C is clearly erroneous because she repeatedly tested negative for drugs and was assessed to have made "incredible progress" with respect to her substance abuse issues.

DHS Social Worker Lisa Cook (**Cook**) testified at the July 2, 2020 trial hearing that Mother "addressed the substance abuse issues and made incredible progress in that area," and DHS's October 1, 2020 Safe Family Home Report indicated that she had tested clean for substances since March 2020.  However, Mother tested positive for substances several times in February 2020 after a year of services, and despite having completed her substance abuse treatment at that time.  Indeed, Mother's psychological evaluation indicated she would be vulnerable to substance abuse relapse if she reconnects with Father while he is still actively using substances, she acknowledged she tested positive for substances when she temporarily resumed her off-and-on relationship with Father in February 2020, and she admitted at the September 24, 2020 continued trial that she and Father had again resumed a romantic relationship.  Because Mother's substance abuse issues reemerged while she was in a relationship with Father, despite completing services, the Family Court reasonably could find that she cannot fully resolve her substance abuse issues until she fully terminates her relationship with Father.  Thus, because Mother re-engaged her relationship with Father several times during the course of the proceeding, including while trial was ongoing, substantial evidence supports the Family Court's finding that her substance abuse issues were not resolved at that time.

**FOF EE** provides as follows:  "Mother testified on July 30, 2020, that she was not in a relationship with Father, and therefore, their domestic violence issues had no current effect

on the children[.]"  Mother argues that FOF EE is clearly erroneous as it implies Mother testified her history of domestic violence with Father had no current effect on the Children.  We disagree.  FOF EE accurately describes portions of Mother's testimony.  However, we recognize that Mother also acknowledged at trial that the Children were still dealing with trauma from witnessing past domestic violence incidents.  Moreover, the Family Court found in unchallenged FOF W that "Parents have a long history of domestic violence issues, and Mother acknowledges that the children have been traumatized by witnessing the domestic violence[.]"  Given the record, FOF EE is not clearly erroneous.

**FOF WW** provides as follows:  "The parties have not made progress toward resolving the problems that necessitated placement[.]"  Mother argues that FOF WW is clearly erroneous as pertaining to her because the record is "replete with indications" that she progressed with respect to the problems necessitating placement.  DHS argues that Mother "lost" any of her progress when she lost the ability to have unsupervised visits with the Children due to her problematic romantic relationship with Father and after an accident where the youngest child, KK, nearly drowned while in her care.

Mother's argument has some merit.  According to DHS's November 13, 2018 Petition for Temporary Foster Custody (**Petition**), Mother's problems that necessitated placement are that:  the Children are vulnerable due to their young age; Mother failed to provide them with clothing and adult supervision in a timely manner; Mother has "a history of unresolved substance abuse issues"; and her "current impairment due to substance abuse [was] affecting her ability to supervise, protect or care" for the Children.  DHS required Mother to, inter alia, participate in substance abuse assessment and treatment, ongoing random drug testing, psychological evaluation and treatment, to cooperate and keep regular contact with a DHS social worker, work in

11

partnership with DHS to ensure the Children's needs are met, engage in weekly visits with the Children, participate in domestic violence groups, and attend parenting education classes.

DHS Social Worker Karen Morrison (**Morrison**) testified at trial on July 2, 2020, that:  Mother completed all services ordered, and she believes Mother can meet the Children's basic needs.  Similarly, Cook testified at trial that same day that Mother "addressed the substance abuse issues and *made incredible progress* in that area and began to make progress in addressing the issues of being protective of her children from witnessing domestic violence."  Thus, it appears Mother has made some progress during the case.

However, the record also indicates that Mother's relationship with Father is a fundamental part of the problem that necessitated placement of the Children and that has prevented Mother from providing a safe family home, and those circumstances do not appear to have changed or progressed. Specifically, the record reflects that: Mother met Father when she was 14 years old and he was 20 years old, and as of 2019, they had been in a relationship for fifteen years; Father was the person who first introduced Mother to methamphetamines; their relationship involved domestic abuse, infidelity, mistrust, and drugs; Mother's psychological evaluation indicated she would be vulnerable to drug relapse if she reconnected with Father while he is using; Mother did in fact test positive for substances when she temporarily resumed a relationship with Father, despite having fully completed her substance abuse treatment; and Father continues to have substance abuse issues.  Father also has not altered his pattern of domestic abuse, and the eldest child has expressed concerns that Mother and Father will inevitably reunite and expose the Children to domestic violence again.  There is ample evidence in the record that Mother's continued on and off relationship with Father significantly undermines her ability to provide a safe family home for the Children.

We conclude that FOF WW is clearly erroneous <u>in part</u>, to the extent that it fails to recognize Mother's past progress in addressing her personal substance abuse and neglect issues. However, FOF WW is not clearly erroneous in that there is substantial evidence that Mother has been consistently unable to break free of her relationship with Father, which has inevitably resulted in substance use and physical abuse, and thus, Mother has not progressed in addressing the root cause of her inability to provide a safe family home for the Children.

**B.  Mixed Conclusions and Findings RR, XX, and BBB**

Mother next contends the Family Court abused its discretion in entering Mixed Conclusions and Findings RR, XX, and BBB, which respectively provide as follows:  "RR The proposed permanent plan/s are in the best interests of the child/ren[,]" "XX the appropriate permanency goal for the child(ren) is . . . permanent out of home placement[,]" and "BBB The child(ren)'s placement is safe and appropriate[.]"

The appellate court reviews mixed questions of law and fact under the clearly erroneous standard because the Family Court's conclusions are dependent upon the facts and circumstances of each individual case.  <u>In re Doe</u>, 95 Hawaiʻi at 190, 20 P.3d at 623.

Mother contends the following factors contradict Mixed Conclusions and Findings RR, XX and BBB, and weigh in favor of granting her further reunification efforts[3]:  there is no history

---

[3]  Mother cites <u>Interest of AC</u>, No. CAAP-18-0000886, 2019 WL 5966938, at *2 (App. Nov. 13, 2019) (Order Dismissing Appeal for Lack of Jurisdiction) to argue that HRS § 571-46 provides the standard for determining the best interests of the child in a Child Protective Act case.  However, HRS § 571-46 applies in proceedings involving a dispute as to the custody of a minor child. <u>AA v. BB</u>, 139 Hawaiʻi 102, 106, 384 P.3d 878, 882 (2016).  In <u>Interest of AC</u>, this court considered HRS § 571-46 *in pari materia* with HRS Chapter 587A to conclude there is no legal preference anywhere in Hawaiʻi law for in-state placement over out-of-state placement when considering a child's best interest.  2019 WL 5966938, at *2.  This is because "[l]aws in pari materia, or upon the same subject matter, shall be construed with reference to each other.  What is clear in one statute may be called in aid to explain what is doubtful in another."  HRS § 1-16 (2009).  However, nothing in <u>Interest of AC</u>
(continued...)

13

of sexual or physical abuse; she resolved her issues of neglect; the Children are closely bonded with her; she consistently and actively participated in the Children's caregiving throughout the case; she can meet the Children's basic needs and provide for their emotional needs; and though her off-and-on relationship with Father is concerning, permanent placement with Paternal Grandparents is not safe or appropriate given her uncontroverted testimony that Father resides in Paternal Grandparents' home, where the Children are placed (**Foster Home**), and he has regular contact with the Children there.  Mother further contends the record shows she is "at least as 'responsible and competent'" as Paternal Grandparents in caring for the Children, and thus, the best interests of the Children are "ambiguous at best," but the relevant considerations "tip the scales" in favor of placement with her or some alternative arrangement given Mother's "fundamental liberty interest in the care, custody, and management of [her] children."

DHS argues that: (1) the Permanent Plan is in the Children's best interests because the Children had lived at the Foster Home for nineteen months by the time of the October 15, 2020 reopened trial hearing; at the time of initial placement, the three eldest Children were already staying with Paternal Grandparents pursuant to Mother's own arrangement with them; and the eldest child desires to remain with Paternal Grandparents; (2) that the appropriate permanency goal for the Children is permanent out of home placement because Mother admitted to resuming her romantic relationship with Father, and Mother fails to appreciate the likelihood that the Children would be exposed to violence if Parents met up in the same home where the Children are placed; and (3) that Mother waived any challenges to the

---

[3](...continued)
indicates that HRS § 571-46 provides the standard for a child's best interests in a termination of parental rights hearing under HRS § 587A-33(a)(3).  Thus, while we address Mother's arguments, we decline to accept HRS § 571-46 as providing the governing standard.

safety and appropriateness of the Foster Home by not objecting to the Family Court's numerous findings that it is safe and appropriate.

Regarding DHS's waiver argument, "[l]egal issues not raised in the trial court are ordinarily deemed waived on appeal." Ass'n of Apt. Owners of Wailea Elua v. Wailea Resort Co., 100 Hawaiʻi 97, 107, 58 P.3d 608, 618 (2002).  Citing Hawaiʻi Family Court Rules (**HFCR**) Rule 46[4], Mother contends she had no prior reason to object to the safety of the Foster Home, as she did not know Father lived there until the time of trial, but she thereafter raised the issue in her closing argument. Mother is correct in that her testimony at the October 15, 2020 reopened trial is the first and only evidence that Father resides at the Foster Home, and she did raise the issue in her October 19, 2020 Supplemental Closing Argument.  Thus, the objection is not waived.

As to whether the record supports Mixed Conclusion and Finding **BBB** (that the Foster Home is safe and appropriate), Morrison testified at the July 2, 2020 trial hearing that she believed the Foster Home was safe based on her prior monthly meetings with Paternal Grandparents at the Foster Home and that she was not concerned for the safety of the Children there or that Paternal Grandparents would not be protective if Father were to come around the Children and do "anything inappropriate or dangerous."  Thus, based on the evidence in July 2020, the Family

---

[4]  HFCR Rule 46 provides:

> Formal exceptions to rulings or orders of court are unnecessary; but for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action that the party desires the court to take or the party's objection to the action of the court and grounds therefor; and, if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice the party.

Court could find that, absent any changes in the Foster Home, it remained safe based on Morrison's prior in-person assessments[5] and her belief that Paternal Grandparents could keep the Children safe from Father.

However, given Mother's uncontested testimony three months later at the reopened trial on October 15, 2020, that Father was living at the Foster Home, his residing there raises new safety concerns that should have been addressed but were not. Notably, neither Morrison nor Cook opined whether Paternal Grandparents could keep the Children safe if Father lived in the Foster Home with them, especially given the record of Father's continued use of substances, or whether Paternal Grandparents could keep the Children from witnessing domestic violence incidents if Father and Mother were together at the Foster Home in the Children's presence.  Indeed, the primary reason for reopening the trial in October 2020 was to allow Mother to testify about a Temporary Restraining Order (**TRO**) she filed against Father on October 7, 2020, due to a physical abuse incident between Father and Mother at the Foster Home on October 5, 2020.  DHS expressly notes that Mother and Father being together in the same place raises safety concerns, arguing in this appeal that "Mother failed to appreciate the likelihood that the Children would be exposed to a violent incident *if Parents met up in the same home where the [Children] were placed*." Thus, if DHS required Mother to maintain a TRO or some other protective measure to keep Father away so as to avoid violent incidents in the Children's presence, Father's residing at the Foster Home should raise significant concerns about the well being of the Children and whether the Foster Home can be deemed safe.

---

[5]  Mother also argues that Paternal Grandparents' home is not safe or appropriate because it is the same home where the abusive Father was raised. This argument is not only speculative, but it is contradicted by Morrison's testimony.

No party appears to have requested, and the Family Court did not make any findings, about Mother's uncontroverted testimony about Father living at the Foster Home.  In short, there appears to be nothing to indicate whether this aspect of the case –– Father's residing at the Foster Home –– has been considered or addressed by the Family Court.  If Father does reside at the Foster Home, the absence of evidence of protective measures against him and his substance use, or against domestic violence incidents between Mother and Father, and the lack of any details about his residing there given the record in this case, weighs heavily against a finding that the placement is safe and appropriate.  Accordingly, on this record, we conclude that the current record does not contain substantial evidence to support Mixed Conclusion and Finding BBB, and therefore, the Family Court clearly erred as to BBB.

Mixed Conclusion and Finding **RR** (that the proposed permanent plan is in the Children's best interests) concerns the third element of HRS § 587A-33(a).  The Family Court presumes it is in a child's best interests to be "promptly and permanently placed with responsible and competent substitute parents and family *in a safe and secure home*."  See HRS § 587A-33(a)(3)(A) (emphasis added).  While the Permanent Plan does not explicitly state that the Children are to be adopted by the Paternal Grandparents, it appears this is the intended goal, as the Permanent Plan indicates, *inter alia*:  its goal is placement for adoption by December 2020; the Paternal Grandparents are willing to adopt; and DHS "continues to discuss adoption with" the Paternal Grandparents.  It also does not identify any other presumptive adoptive parent.  Thus, the record indicates the Permanent Plan's goal is adoption by the Paternal Grandparents. Given the record, the Family Court must address whether Father is residing at Paternal Grandparent's house, *i.e.*, the Foster Home, and, if so, the consequences of that affecting whether such placement is safe for the Children and whether it is in the

17

Children's best interests to be placed there.  Given Mother's uncontested testimony, Father was living at Paternal Grandparent's house in October 2020, and the evidence in the record shows that Father continues to use substances and has had multiple physical altercations with Mother.  Accordingly, given the state of the record, there is no clear and convincing evidence that the Permanent Plan is in the Children's best interests.  Thus, the Family Court clearly erred in Mixed Conclusion and Finding RR.

As to Mixed Conclusion and Finding **XX** (that the appropriate permanency goal for the Children is permanent out-of-home placement), we note that by January 2020, DHS was statutorily required to move to terminate parental rights based on the amount of time the Children had been in foster care.  See HRS § 587A-31(g) (2018).  At trial on July 2, 2020, both Cook and Morrison testified that Mother could not presently provide a safe family home, and they were not confident she should have more time to be willing and able to do so given the amount of time remaining and her unresolved off-and-on relationship with Father.  As neither of Mother's social workers testified that she was then on track to provide a safe family home, substantial evidence supports the permanency goal of permanent out-of-home placement.  Accordingly, the Family Court did not clearly err in Mixed Conclusion and Finding XX.

As to Mother's remaining arguments, while she is correct in that: there is no history of sexual or physical abuse, she had addressed her issue of neglect, the Children are bonded with her, she consistently and actively participated in the Children's caregiving, and she can meet and provide for the Children's basic and emotional needs, the record nonetheless reveals a history of domestic abuse and tendency to return to substance abuse through her relationship with Father, which, until fully resolved, remains a significant safety issue for the Children.  As to her argument that the scales "tip" in favor of

placement with her due to her "fundamental liberty interest in the care, custody, and management of [her] children," Mother provides no authority that this interest is determinative, under the circumstances of this case, with respect to the proper placement for purposes of a permanent plan.  Thus, her arguments are unavailing.

**C.  The Family Court Did Not Clearly Err in Concluding Mother Would Not Be Able to Provide a Safe Family Home in a Reasonable Time**

Mother argues there is no clear and convincing evidence she was not presently, or in the reasonably foreseeable future, willing and able to provide a safe family home, even with the assistance of a service plan, because: DHS's own experts conceded that more time might be appropriate; Mother complied with all service plan requirements; and Mother only reunited with Father in good faith reliance on his representations that he would participate in services.

We acknowledge that at the July 2, 2020 trial, Cook testified Mother made incredible progress in addressing her safety issues, and Morrison testified that Mother had completed her services and tasks by February 2020.  However, due to remaining domestic violence issues, Morrison told Mother in or about January 2020 that she must file a TRO against Father.  In light of the fact that Mother withdrew her TRO against Father by the time of trial and re-engaged in a relationship with him, neither Cook nor Morrison were confident Mother could demonstrate her willingness and ability to provide a safe family home in a reasonable time given the amount of time the Children had already been in foster care.

We do not overlook Mother's progress in addressing her safety issues and her filing of a new TRO in October 2020, which demonstrate Mother made efforts to address the safety issues in the family.  However, "[i]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of

witnesses and the weight of the evidence; this is the province of the trier of fact." In re Doe, 95 Hawai‘i at 190, 20 P.3d at 623.  (Citation omitted).  The Family Court need not accept Mother's representation that she has now permanently terminated her relationship with Father, especially considering that she re-engaged with Father between trial dates; she testified that she is "addicted" to Father; Father is her only significant romantic partner and is the Children's biological father; and despite being instructed to maintain a TRO for the duration of the case, she withdrew a prior TRO and re-engaged with Father based on his representations that he would participate in services, which he ultimately did not.  The record indicates that Mother is unable to prioritize the Children's needs and safety above her own desire to reunify with Father, which has long been identified as the significant issue that Mother has had to address in this case.

Accordingly, the Family Court did not clearly err in concluding that Mother would not be willing and able to provide a safe family home for the Children within a reasonable time.

### D.  The Termination Order

Mother's fourth point of error contends the Family Court abused its discretion in terminating her parental rights. Given that the record lacks clear and convincing evidence that the Permanent Plan is in the Children's best interests, not all of the requirements of HRS § 587A-33(a) are met.  In In re R Children, 145 Hawai‘i 477, 482-84, 454 P.3d 418, 423-25 (2019), the Hawai‘i Supreme Court held that a father's parental rights could not be terminated where all of the requirements of HRS § 587A-33(a) were not met.  The supreme court stated that HRS § 587A-33:

> provides that the family court shall terminate a parent's parental rights if it finds that: (1) the parent is not able to provide a safe family home for the child now or within a reasonable period of time (HRS §§ 587A-33(a)(1)-(2)); (2) the proposed permanent plan is in the best interests of the

child (HRS § 587A-33(a)(3)); and (3) the child consents to the permanent plan if the child is at least fourteen years old (HRS § 587A-33(a)(4)).  Pursuant to section (h) of the CPA Provision, if the family court does not find that all of these requirements are met, the family court shall take further steps to establish permanency for the child. HRS § 587A-33(h).  <u>However, nothing in [HRS § 587A-33] indicates that the family court can terminate a parent's parental rights if fewer than all of the above requirements are met</u>.

. . . .

<u>The family court's order terminating Father's parental rights **without finding that the proposed permanent plan was in KK's best interests** contravenes the plain language of the [HRS § 587A-33]</u>. The family court found by clear and convincing evidence that the requirements set forth in HRS §§ 587A-33(a)(1) and (a)(2) were met, but explicitly determined that the requirement of HRS § 587A-33(a)(3) was not met.  <u>Because not all of the requirements set forth in the [HRS § 587A-33] were met, the statute did not provide the family court authority to terminate Father's parental rights. See HRS § 587A-33(h)</u>.

<u>Id.</u> at 483-84, 454 P.3d at 424-25 (Emphases added)(footnote omitted).

Here, because we conclude above that there was no clear and convincing evidence to support Mixed Conclusion and Finding RR -- *i.e.*, that the proposed permanent plan is in the Children's best interests -- not all the requirements of HRS § 587A-33 have been met in this case.  Thus, pursuant to <u>In re R Children</u>, we must also conclude the Family Court erred in terminating Mother's parental rights.

## IV.  Conclusion

Based on the above, the December 8, 2020 Decision and Order Terminating the Parental Rights of [Father] and [Mother] and Awarding Permanent Custody is vacated.  We remand the case to the Family Court for further proceedings and findings, including to address: whether Father resides with Paternal Grandparents at the Foster Home, and if so, whether the Foster Home is safe; whether permanent placement at the Foster Home is in the Children's best interests; and whether Mother's parental rights should be terminated.  The Family Court may take further action

as it deems necessary, including but not limited to addressing any changed circumstances in the case.

DATED:  Honolulu, Hawaiʻi, September 27, 2021.

On the briefs:

Matthew Mannisto,
for Respondent-Appellant.

Russell K. Goo,
Julio C. Herrera,
Ian T. Tsuda,
Patrick A. Pascual,
for Petitioner-Appellee.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Katherine G. Leonard
Associate Judge

/s/ Karen T. Nakasone
Associate Judge